**OPINION OF THE JUSTICES of the Supreme Judicial Court Given Under the Provisions of Section 3 of Article VI of the Constitution.**

Supreme Judicial Court of Maine.

Questions Propounded by the Governor in a

Communication Dated July 16, 1981.

Answered Aug. 27, 1981.

598

*State of Maine*

[SEAL]

## OFFICE OF THE GOVERNOR

### AUGUSTA, MAINE 04333

July 16, 1981

To the Honorable Justices of the Supreme Judicial Court:

By virtue of the authority conferred upon the Governor by the Constitution of Maine, Article VI, Section 3, and believing that the questions contained herein are important questions of law and that it is a solemn occasion,

I, Joseph E. Brennan, Governor of Maine, submit the following statement of facts and questions of law and respectfully ask the opinion of the Justices of the Supreme Judicial Court thereon:

### STATEMENT OF FACTS

On June 19, 1981, S.P. 598, L.D. 1594, "AN ACT to Clarify the Status of Certain Real Estate Titles in the State," a copy of which is attached hereto as Appendix "A," was passed by the House of Representatives and the Senate of the State of Maine. On the same day, the bill was presented to the Governor, and the first regular session of the 110th Legislature was adjourned *sine die*. Pursuant to Article IV, Part 3rd, Section 2 of the Maine Constitution, the bill is pending approval or return by the Governor. The Governor must act before the expiration of the third day after the convening of the next meeting of the 110th Legislature, which is in session for at least three days, or L.D. 1594 will become law by operation of the Maine Constitution.

The historical circumstances preceding the passage of L.D. 1594 may be briefly summarized. Over a period of many years, private parties have placed structures on, or

filled in, submerged and intertidal lands within the State of Maine. In most instances, it appears that these actions were carried out without any conveyance or authorization from the State. In some cases, however, the parties did seek and secure State approval in the form of legislative resolves licensing the placement of structures on State-owned land. An example of such a resolve is attached hereto as Appendix "B." The private parties asserting ownership of the structures and filled land have used and conveyed the land as their own, often for long periods of time without payment of any consideration to the State and without any acknowledgement of the existence of a public trust in the lands.

The lands on which structures have been erected and which have been filled appear to include a substantial portion of the critically located submerged land within the State. For example, a substantial portion of the waterfront of Portland Harbor appears to be filled land. A map prepared by the Maine Department of Transportation depicting the low water line in 1833 compared to that in 1981 is attached hereto as Appendix "C."

In 1975, the State enacted legislation, now codified in 12 M.R.S.A. Sec. 558 (1981 Supp.), which delegated to the Bureau of Public Lands of the Department of Conservation the authority to lease for a limited period of time certain of the State's interests in submerged and intertidal lands to private parties for the purpose of permitting them sufficient right, title and interest to lawfully develop the land. The legislation also granted a 30–year easement to the owners of structures actually upon submerged or intertidal lands as of the effective date of the act.

L.D. 1594, the bill now pending action by the Governor, would go beyond the prior legislation by releasing the State's ownership interest in submerged and intertidal lands which were filled as of October 1, 1975, to the "owners" of those filled lands. By its terms, the bill would apply to the "state's ownership in public trust" but not to rights or interests acquired by the State

by gift, purchase or the power of eminent domain. As made clear in the preamble, L.D. 1594 is predicated on the assumption that the affected land is impressed with a public trust and that this trust responsibility will be served by releasing the State's interest in the land.

Serious questions have been raised as to whether L.D. 1594 may be validly enacted. The principal concern is whether enactment of the legislation would be consistent with the State's legal responsibilities as trustee of the submerged lands. In particular, we are concerned by the following specific aspects of the legislation:

First, the bill would release the State's interest in the affected lands without any restriction on, or knowledge of, the purposes for which those lands could be used. Second, L.D. 1594 would effect a wholesale conveyance of the State's interests, without any determination of the amount or location of the land to be affected. Third, the bill was passed by the House and the Senate apparently without any determination of its effect on the public interest in the remaining submerged and intertidal lands.

Given the potential effect of L.D. 1594 and the uncertainty surrounding its validity, the Governor has need of guidance on the nature of the State's trust responsibility over the submerged lands and intertidal lands and the manner in which that responsibility may be discharged. Such guidance is necessary not only to avoid the enactment of invalid legislation, but also to insure that, if L.D. 1594 is finally enacted into law, it will accomplish its purpose of clearing the way for the full use and development of the filled lands.

Therefore, I respectfully request answers to the following questions:

## QUESTIONS OF LAW

1. Does the State of Maine have a trust responsibility for the benefit of the people of Maine in lands which are now or were formerly submerged under the territorial waters and great ponds, or in lands which are now or were formerly intertidal lands?

2. If the answer to Question 1 is in the affirmative, what are the rights of the beneficiaries and responsibilities of the trustee with respect to the filled, submerged and intertidal lands impressed with the trust?

3. Would L.D. 1594, if enacted into law, be invalid as exceeding the authority of the Legislature, under Article IV, Part 3rd, Section 1 of the Maine Constitution, to make and establish all reasonable laws and regulations for the defense and benefit of the people of this State, not repugnant to the Constitutions, of the State of Maine or the United States?

4. Would L.D. 1594, if enacted into law, be invalid as violative of the State's legal responsibilities as trustee for the public of the submerged and intertidal lands located in tidal waters and great ponds of Maine?

5. Would L.D. 1594, if enacted into law, effectively eliminate any claim of the State to an ownership interest in the filled land, as defined in the bill, based upon public trust principles?

Respectfully,

/s/ Joseph E. Brennan

JOSEPH E. BRENNAN

Governor

APPENDIX A

# STATE OF MAINE

IN THE YEAR OF OUR LORD NINETEEN HUNDRED AND EIGHTY-ONE

S. P. 598 — L. D. 1594

AN ACT to Clarify the Status of Certain Real Estate Titles in the State.

Be it enacted by the People of the State of Maine, as follows:

12 MRSA § 559 is enacted to read:

## § 559. Filled-in submerged lands

1. **Legislative intent; purpose.** The Legislature finds that the ownership of certain areas along Maine's coast and great ponds is uncertain because portions of the submerged and intertidal lands have been filled-in so as now not to be subject to tidal action or below water. Such lands were filled prior to the enactment of Public Law 1975, chapter 287, as reallocated by Public Law 1979, chapter 545. It appears that prior to the enactment of the Submerged Lands Act, and to some degree afterwards, these filled-in portions of the submerged or intertidal lands have been sold, leased, taxed, and otherwise treated in good faith by municipalities and private citizens as if such were owned in fee by private parties. Due to the lack of readily available documentation of the natural low and high watermarks in most areas along the coast and great ponds, the process of setting the boundaries between submerged or intertidal lands and the upland would consume enormous time and expense for the State and the private parties.

The Legislature recognizes that the submerged lands are owned by the State for the benefit of the public. These lands are impressed with a public trust. This ownership and public trust is derived from the Massachusetts Colonial Ordinance of 1641-1647. As a result of this, submerged land is not, like ordinary private land, held in fee simply absolute but is impressed with the public trust which gives the public's representatives an interest and responsibility in its development.

The Legislature finds that those portions of the submerged and intertidal lands which have been filled in prior to October 1, 1975, the date the Submerged Lands Act was enacted, are substantially valueless for trust uses, and such lands can be disposed of without impairment of the public trust in what remains. The public benefit will be promoted by clarifying the status of real estate titles to such filled lands, thereby permitting full use and development.

2. Definitions. As used in this section unless the context otherwise indicates the following terms have the following meanings.

A. "Filled land" means portions of the submerged and intertidal lands which have been rendered by the acts of man, to be no longer subject to tidal action or below the natural low watermark, as of October 1, 1975.

B. "Intertidal land" means all land affected by the tides between the natural high watermark and either 100 rods seaward therefrom or the natural low watermark, whichever is closer to the natural high watermark.

C. "Person" means individuals, partnerships, corporations and other private legal entities but does not include the State and its political or governmental subdivisions or the Federal Government.

D. "Submerged land" means all land affected by the tides seaward of the natural low watermark or 100 rods from the natural high watermark, whichever is closer to natural high watermark, and all land below natural low watermark under great ponds.

3. Declaration of clear title. Titles to properties and lands that once were or may have been submerged or intertidal lands subject to the state's ownership in public trust that have been filled as of October 1, 1975, are hereby declared and released to the owners of any such filled lands by the State free of any claimed ownership in public trust to the extent the areas of these properties and lands were not submerged or intertidal lands on that date.

4. Confirmation. Any person may seek confirmation from the Bureau of Public Lands that particular land is filled land and receive a declaration that may be filed in the appropriate registry of deeds. Such application for confirmation shall be filed on a form prescribed by the Bureau of Public Lands which shall contain the following information:

A. Name and address of applicant;

B. An accurate legal description of the filled land; proof that such land was filled as of October 1, 1975, and sufficient details, such as a survey by a registered land surveyor, to locate such filled land on a map of general acceptability;

C. The area of acreage of the filled land;

D. The date acquired;

E. Other information necessary for the purposes of this section.

A filing fee of $50 shall accompany each application to cover administrative costs.

5. Filing. The following provisions apply to filing.

A. The application may be filed with the Bureau of Public Lands at any time.

B. If the applicant demonstrates that the land is filled land as difined in subsection 2, paragraph A, the Director of the Bureau of Public Lands shall issue a declaration to the effect. The director shall respond to the application within 30 days of the date the application is received by the director.

6. Operation of this Act. This Act shall not create a cause of action on behalf of any person against the State for damages or otherwise arising out of State ownership of lands prior to the effective date of this Act. This Act shall not be construed either to convey or release rights or interest acquired by the State in filled lands by gift, purchase or the power of eminent domain or to effect any obligations, rights or liabilities created by operation of sections 4701 to 4709 as later replaced by Title 38, sections 471 to 478 by permits issued thereunder. This Act shall be retroactive to October 1, 1975.

7. Termination. Any leases entered into by the Director of the Bureau of Public Lands, pursuant to section 558, for filled land, as defined in subsection 2, paragraph A, are hereby terminated. Lessees shall not be reimbursed for rental paid under such leases.

IN HOUSE OF REPRESENTATIVES, ...June 19... 1981

Read twice and passed to be enacted.

............................................................Speaker

In Senate, ...JUN 19.....................................1981

Read twice and passed to be enacted.

.........................~~signature~~............ President

Approved..............................................1981

..........................................................Governor

## APPENDIX B

## Chapter 652.

### An act to incorporate the Richardson Wharf Company.

*Be it enacted by the Senate and House of Representatives in Legislature assembled,* as follows:

Corporators.

SECT. 1. Joshua Richardson, N. P. Richardson, Edward E. Upham, George F. Shepley, John W. Dana, N. O. Cram and Leonard D. Shepley, their associates, successors and assigns, are hereby created a body politic and corporate, by the name of the Richardson Wharf Company, with power to sue and be sued, to have a common seal, and to make all rules and by-laws, necessary for the convenient management and regulation of their real and personal estate, and of their common concerns, not repugnant to the laws of this state, and to have and enjoy all the powers and privileges of similar corporate bodies in this state.

Corporate name.
By-laws, &c.
Powers, privileges, &c.

SECT. 2. The said corporation may purchase and hold real and personal estate, to an amount, not exceeding at any one time the sum of one hundred and fifty thousand dollars, with full power to manage and dispose of the same.

May purchase and hold real and personal estate.
Amount.

SECT. 3. The said corporation may purchase and hold the real estate, wharf and flats, situate in Portland, on the southerly side of Fore street, and between Brown's wharf and Merrill's wharf, and are hereby authorized, at their own expense, to enlarge the wharf, now on said premises, and extend the same into the harbor of Portland, below low water mark, to such distance as said corporation may think expedient, not however below the line designated by the commissioners' report on Portland harbor, and not to interfere with any wharf now existing, and not to acquire by force of this charter, as against proprietors of adjacent flats on either side, any greater or other

May hold wharf, flats, &c.
May enlarge and extend wharf a certain distance.
Restrictions.

rights than now appertain to the proprietors of the land and flats aforementioned.

SECT. 4. Any two of the persons named in this act, may call the first meeting of said corporation, at such time and place as they may see fit, by giving notice of the same, for one week, in some newspaper printed in Portland, for the purpose of organizing said corporation.

<div style="float:right">First meeting, how called.</div>

SECT. 5. This act shall take effect from and after its approval by the governor.

[Approved April 2, 1856.]

## APPENDIX C

1833 map and current aerial photograph not here reproduced.

## ANSWERS OF THE JUSTICES

To the Honorable Joseph E. Brennan, Governor of Maine:

In compliance with the provisions of section 3 of article VI of the Constitution of Maine, we, the undersigned Justices of the Supreme Judicial Court, have the honor to submit the following responses to the questions you propounded on July 16, 1981.

As we explain below, we understand both Questions 3 and 4 to ask whether enactment of the legislative document designated L.D. 1594 is within the legislature's constitutional authority. Our answers to those questions are the crux of the advice you seek. For convenience we therefore first consider those questions. Our responses to the other questions follow at the end.

## QUESTIONS 3 and 4

■ We have the constitutional duty and authority to render an advisory opinion on Questions 3 and 4. The Governor is sworn to support the Constitution, as are we, and the constitutionality of a bill pending before him awaiting his signature presents an "important question of law" on a "solemn occasion" within the meaning of Me.Const. art. VI, § 3. See Opinion of the Justices, Me., 260 A.2d 142, 146 (1969).

■ We conclude that L.D. 1594, although presented to the Governor on June 19, 1981, is still awaiting his action in signing or vetoing it. Ordinarily, L.D. 1594 would have become law when not acted upon by the Governor within ten days. See Me.Const. art. IV, pt. 3, § 2.[1] However, the adjournment of the Legislature tolled that period, and the Governor has until three days after the next meeting of the 110th Legislature to act on the bill. Id. It is true that the Legislature met in special session for one day on August 3, 1981. We are of opinion, however, that article IV, pt. 3, § 2 requires that the same Legislature must be continuously in session for three days before the period in which the Governor may act on the pending bill expires. That is so because article IV, pt. 3, § 2 also provides that the Governor, if he disapproves a bill, shall return it to the Legislature, obviously for the purpose of the Legislature's reconsideration. The Legislature would have no opportunity to do that unless it is still in session. See 1979 Op.Me.Att'y Gen.No. 170 (September 21, 1979). L.D. 1594 has therefore not yet become law; it is still awaiting the Governor's signature; and whether he may constitutionally sign it into law is a question of "live gravity" on which he may

---

1. In pertinent part, Me.Const. art. IV, pt. 3, § 2 provides:

    If the bill or resolution shall not be returned by the Governor within ten days (Sundays excepted) after it shall have been presented to him, it shall have the same force and effect, as if he had signed it unless the Legislature by their adjournment prevent its re- turn, in which case it shall have such force and effect, unless returned within three days after the next meeting of the same Legislature which enacted the bill or resolution; if there is no such next meeting of the Legislature which enacted the bill or resolution, the bill or resolution shall not be a law.

require the Justices' opinions.[2] *See Opinion of the Justices*, Me., 355 A.2d 341, 389 (1976).

■ The operative provision of L.D. 1594 releasing "any such filled lands"[3] from any claims of state ownership in public trust gives such releases to the "owners" of those filled lands. *See* 12 M.R.S.A. § 559(3) proposed by L.D. 1594. That term "owners" is undefined and ambiguous, but it is not appropriate for the Justices in an advisory opinion to state their views on the future effect or application of a proposed statute without the benefit of adversary presentations in a litigated case by the parties who may be affected. *See* our comment below on Question 5. We will, solely for the purposes of this advisory opinion, assume that L.D. 1594 accomplishes the release of the State's public trust rights in any and all intertidal and submerged lands that were filled as of October 1, 1975, subject to the reservation of proposed 12 M.R.S.A. § 559(6).[4]

By the common law of England that was brought to this country by the earliest settlers, title to all tidelands[5] was vested in the Crown. The Crown could convey to private subjects the *jus privatum*, or private right or title, to tidelands, but that *jus privatum* always remained subject to the *jus publicum*, the public rights of fishing and navigation. *See Moulton v. Libby*, 37 Me. 472, 485–87 (1854); *Shively v. Bowlby*, 152 U.S. 1, 11–13, 14 S.Ct. 548, 551–52, 38 L.Ed. 331 (1894). Only the Parliament, as the public's representative, could alienate the *jus publicum*. *See Appleby v. City of*

New York, 271 U.S. 364, 382, 46 S.Ct. 569, 574, 70 L.Ed. 992 (1926). By virtue of the American Revolution, the states succeeded to all the rights of both the Crown and the Parliament in tidelands, including the Parliament's power to limit or extinguish the *jus publicum*. *Appleby v. City of New York, supra* at 381, 46 S.Ct. at 573; *State v. Leavitt*, 105 Me. 76, 78–79, 72 A. 875, 876 (1909). The Colonial Ordinance of 1641–47 had modified the common law in Massachusetts to meet the needs of that colony's settlers; in order to promote the construction and maintenance of wharves, it vested the upland owner with title in fee simple in intertidal lands, providing, however, that though the upland owner could fill or build upon those lands, he could not fill or build so as unreasonably to interfere with the public rights of navigation. *See Sawyer v. Beal*, 97 Me. 356, 357–58, 54 A. 848, 848 (1903); *Barrows v. McDermott*, 73 Me. 441, 447–48 (1882). *See also Boston Waterfront Development Corp. v. Commonwealth*, 378 Mass. 629, ——, 393 N.E.2d 356, 360–61 (1979). Though the Colonial Ordinance thus granted the fee in intertidal lands to upland owners, it at the same time reserved for public ownership all land under "great ponds," defined as ponds of more than 10 acres, and declared the great ponds free for any person to fish and fowl there. As a result, private title in the great ponds was no more possible than in the submerged tidelands.[6] *Barrows v. McDermott, supra; Opinion of the Justices*, 118 Me. 503, 503–06, 106 A. 865, 867–68 (1919). The English common law of tidelands, as modified by the Colonial Ordinance of 1641–47, has since been incorporated into the common law of

2. At the invitation of the Justices, briefs were submitted by the Attorney General of the State of Maine, by the State Department of Conservation and its Bureau of Public Lands, and by a number of private corporations, individuals, and organizations.

3. In this advisory opinion the terms "filled land," "intertidal land," and "submerged land" will be used as defined in L.D. 1594. *See* proposed 12 M.R.S.A. § 559(2).

4. The reservation stated in the second sentence of proposed 12 M.R.S.A. § 559(6) was said in legislative debates to exclude from the "filled

lands" being released any lands filled in violation of the Wetlands Control Act, which became effective October 7, 1967. *See, e. g.*, 2 Leg.Rec. 1062 (May 12, 1981) (Senate).

5. By "tidelands" we mean "all land affected by the tides" as used by L.D. 1594 in defining both "intertidal land" and "submerged land." *See* proposed 12 M.R.S.A. § 559(2).

6. L.D. 1594 also treats the land under great ponds in the same way as submerged tideland, including both in its definition of "submerged land." *See* proposed 12 M.R.S.A. § 559(2)(D).

Maine. *Id.*; *State v. Leavitt, supra*; 2 H. Henry & D. Halperin, *Maine Law Affecting Marine Resources: State, Public, and Private Rights, Privileges, and Powers* 188 (1970).

On achieving statehood in 1820 the people of Maine through their Constitution declared that "[a]ll power is inherent in the people," article I, § 2, and then vested in the Legislature

> full power to make and establish all reasonable laws and regulations for the defense and benefit of the people of this State, not repugnant to this Constitution, nor to that of the United States.

Me.Const. art. IV, pt. 3, § 1 (the "Legislative Powers Clause"). Effective in 1909 a constitutional amendment took back part of that plenary grant of legislative power by enabling the people by referendum to veto a legislative enactment, Me.Const. art. IV, pt. 3, § 17, and by the initiative process to enact a measure rejected by the Legislature, *id.* § 18.

■ Question 3 asks the opinion of the undersigned Justices whether L.D. 1594 exceeds the authority granted by the people to the Legislature "to make and establish all reasonable laws and regulations for the ... benefit of the people" that are "not repugnant to [the Maine] Constitution, nor to that of the United States." It is our opinion that L.D. 1594 does not exceed the constitutional power of the Legislature. Since a statute that violated the State's legal responsibilities as trustee for the public would not be reasonable for the public benefit and would therefore exceed the Legislature's constitutional powers, we answer Question 4 jointly with Question 3.

In reaching our negative answer to both Questions 3 and 4, we recognize that the Legislature's powers, though broad, are subject to the three-fold limitations that its enactments be "reasonable," be "for the benefit of the people," and not be repugnant to any other provision of the Maine or United States Constitution. Contrary to some intimations in *Moor v. Veazie*, 32 Me. 343, 360 (1850), *aff'd*, 55 U.S. (14 How.) 568, 14 L.Ed. 545 (1852), our Court sitting as the Law Court must bear the ultimate responsibility for determining whether any particular release by the Legislature of the people's rights in submerged or intertidal lands conforms with the constitutional limitations laid down by the Legislative Powers Clause. *See National Hearing Aid Centers, Inc. v. Smith*, Me., 376 A.2d 456, 460 (1977); *Maine State Housing Authority v. Depositors Trust Co.*, Me., 278 A.2d 699, 702–05 (1971). That is not to suggest that the Law Court will ignore the fact that the members of the Legislature are also sworn to uphold both constitutions or to suggest that the Court will fail to pay appropriate deference to legislative findings of fact.

From the legislative purposes recited in proposed 12 M.R.S.A. § 559(1), we understand that the bill is intended as a statute of repose, operating in effect as a statute of limitations on any public trust claims by the State to filled land, barring those claims as to intertidal and submerged lands that were filled as of October 1, 1975. L.D. 1594 relates only to lands that will have been filled for at least six years, a fact of great significance in assessing the extent to which proper regard for the public trust would permit those filled lands to be released from any claim by the State. The legislative debates amply support the recitations of proposed section 559(1) that the bill is intended to avoid protracted and wasteful litigation for both the State and the numerous owners, and to confirm title in filled lands for the benefit of parties, including local taxing authorities, who have relied for long periods on those lands' being private property. *See* 2 Leg.Rec. 1062 (May 12, 1981) (Senate); 2 Leg.Rec. 1645 (June 12, 1981) (House); 2 Leg.Rec. 1669 (June 19, 1981) (Senate). At the same time, the Legislature was by no means blind to the public rights that would be released by L.D. 1594; on the contrary, the Legislature specifically articulated its recognition that the lands in question are "impressed with the public trust which gives the public's representatives an interest and responsibility in its development." *See* proposed 12 M.R.S.A. § 559(1).

■■ Whether a particular piece of proposed legislation is "reasonable for the benefit of the people" can be judged only in light of the particular problem it is designed to address, the relevant factual circumstances in which it will operate, and the action intended to be taken by it. What is reasonable will vary with the subject matter of the bill under review. *See In re Stanley*, 133 Me. 91, 96, 174 A. 93, 96 (1934), *aff'd sub nom. Stanley v. Public Utilities Commission*, 295 U.S. 76, 55 S.Ct. 628, 79 L.Ed. 1311 (1935) (per curiam). In view of the common law principle that the intertidal and submerged lands are impressed with a public trust, a principle that reflects the unique public value of those lands, we believe that any legislation giving up any such public rights must satisfy a particularly demanding standard of reasonableness. Submerged and intertidal lands are not fungible with lands in the interior. Navigation, fishing, and fowling were the historical purposes for which the public trust principle was developed in the common law. Those public uses of intertidal and submerged lands remain important, but others have grown up as well. The press of an increasing population has led to heavy demands upon Maine's great ponds and seacoast for recreational uses. Also, waterside sites are needed for major industrial and commercial enterprises. The intertidal and submerged lands are finite public resources, the demand upon which steadily increases. In dealing with public trust properties, the standard of reasonableness must change as the needs of society change. *See Borough of Neptune City v. Borough of Avon-by-the-Sea*, 61 N.J. 296, 309–10, 294 A.2d 47, 54–55 (1972); *Home for Aged Women v. Commonwealth*, 202 Mass. 422, 434–35, 89 N.E. 124, 129 (1909).

Thus, in testing L.D. 1594 for compliance with the Legislative Powers Clause, we apply a high and demanding standard of reasonableness. In the special circumstances of this legislation, five factors combine to convince us that L.D. 1594 meets that standard.

First, the clearing of title, so that commercial and other activity may go forward unimpaired by legal uncertainties, is a legitimate and important public purpose. The proposed section 559(1) explicitly states that uncertainty as to the ownership of filled lands that had previously been treated as privately owned had arisen after the Submerged Lands Act, P.L. 1975, ch. 287, went into effect on October 1, 1975. *See also* the Senate and House debates on L.D. 1594, 2 Leg.Rec. 1060, 1062 (May 12, 1981) (Senate), 1669 (June 19, 1981) (Senate); 2 Leg.Rec. 1645, 1646, 1647 (June 12, 1981) (House). Plainly, the recently asserted State claim seriously impairs the marketability and the full use and development of any affected parcels. Unlike the grant in *Illinois Central R.R. v. Illinois*, 146 U.S. 387, 13 S.Ct. 110, 36 L.Ed.2d 1018 (1892), in which the entire harbor of Chicago was placed in the hands of a single corporation, L.D. 1594 releases any State right to a large and diverse class of property owners. Insofar as the bill would avert a disruption of the state's economy, the class of benefited persons is much larger than the "owners" of the affected land to whom the release runs. L.D. 1594 is therefore well within the requirement that legislative action confer "a direct public benefit of a reasonably general character, that is to say, to a significant part of the public . . . ." *Opinion of the Justices,* —— Mass. ——, ——, 81 Mass.Adv.Sh. 1361, 1372, 424 N.E.2d 1092 (June 18, 1981) (hereafter *1981 Mass. Opinion of the Justices*). *See also Maine State Housing Authority v. Depositors Trust Co., supra* at 704–05; *State v. Stinson Canning Co.*, 161 Me. 320, 324, 328, 211 A.2d 553, 555–56, 558 (1965). The Legislature found further that municipalities have relied on the filled lands as part of their tax base and that they can ill afford to lose, or be thrown into extended litigation over, those established sources of revenue. *See* proposed 12 M.R.S.A. § 559(1); 2 Leg.Rec. 1669 (June 19, 1981) (Senate). This also is a valid legislative concern. Since the Legislature has found that sufficient documentation is lacking to determine the primitive high and low water marks along 3,000 miles of Maine coast and on the State's great ponds, the present legislation

is a reasonable means of clearing title. The Legislature reasonably could conclude that case-by-case resolution of the existing problem—whether by legislative, administrative, or judicial action—would be costly, time-consuming, and ineffective and would largely disregard the reliance equities that had arisen over the years prior to October 1, 1975.

Second, the Legislature has found that the intertidal and submerged lands that were filled prior to October 1, 1975, are now substantially valueless for public trust uses. We have no reason to reject that legislative finding of fact. The Legislature might reasonably believe that intertidal lands that have been filled are no longer useful for the navigation, fishing and fowling purposes for which the public trust rights in those lands were originally retained. It is true that some submerged land, owned in fee by the State, that has been filled, might be useful for wharves and other shore facilities. However, the Legislature could reasonably conclude that the public need for such facilities, in addition to those that are now available or will become available through private means, is not substantial enough to justify leaving doubts about the titles to all filled lands on the Maine coast and the great ponds. We note that, upon equitable considerations, the California Supreme Court ordered confirmation of private title in filled land even at the same time it held that the public had by conveyances under an 1870 statute retained public trust rights therein; that court put its decision on the ground that the filled land was no longer important for public uses. *City of Berkeley v. Superior Court of Alameda County*, 26 Cal.3d 515, 162 Cal.Rptr. 327, 606 P.2d 362 (1980). *See also 1981 Mass. Opinion of the Justices, supra* —— Mass. at ——,

81 Mass.Adv.Sh. at 1376, 424 N.E.2d 1092 (declaring legislation to be valid that freed filled lands landward of Boston's "1980 line" from any public trust rights); *County of Orange v. Heim*, 30 Cal.App.3d 694, 717, 106 Cal.Rptr. 825, 844 (1973) (legislature may declare filled lands useless for public trust purposes and convey them free of the public trust).

Third, the Legislature also determined that the public trust in remaining intertidal and submerged lands will not be impaired by releasing the State's interest in land filled prior to October 1, 1975. As with the second factor, this finding represents the collective judgment of the Legislature, and we have no basis for rejecting its accuracy. The Legislature is well aware of the conditions and needs of Maine's coastal areas and great ponds, as is evidenced by the extensive legislation it has enacted in recent years regulating those areas.[7]

Fourth, the Legislature has found that an expectation of private ownership has developed in those private parties who for long periods have relied on their title to filled lands and in the municipalities that have taxed those lands. Equity justifies confirming those expectations. *See City of Berkeley, supra*, 26 Cal.3d at 534–36, 162 Cal.Rptr. at 338–39, 606 P.2d at 373–74. The Legislature may legitimately take into consideration the hardship otherwise worked upon persons who for years have dealt with filled lands as their own. Public trust rights in intertidal and submerged lands that are still unfilled remain intact, of course.

Fifth, by releasing title to these filled lands, the State has not lost any of its broad regulatory authority over them. Under its

---

7. *See, e.g.*, Mandatory Shoreland Zoning and Subdivision Control Act, 12 M.R.S.A. §§ 4811–14 (1974 & Supp.1980); Submerged Lands Act, 12 M.R.S.A. § 558 (Supp.1980) (authorizing director of Bureau of Public Lands to grant 30-year leases or easements of submerged and intertidal lands); Wetlands Control Act, 38 M.R.S.A. §§ 471–78 (1978 & Supp.1980) (requiring Board of Environmental Protection permits for alteration of coastal wetlands); Site Location Law, 38 M.R.S.A. §§ 481–90 (1978 & Supp.1980) (requiring developers of certain large projects to obtain permission of Board of Environmental Protection as to site location); Oil Discharge Prevention and Pollution Control Act, 38 M.R.S.A. §§ 541–60 (1978 & Supp.1980) (prohibiting discharge of oil except by permit from Board of Environmental Protection); Wharves and Weirs Act, 38 M.R.S.A. §§ 1021–26 (1978 & Supp.1980) (requiring local approval of wharves and weirs in municipal tidewaters).

inherent police power, the State may extensively regulate private property in the public interest. *See Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). Zoning and other regulatory devices are available and in fact are already being used to regulate the use of all shore property, including the filled lands.[8]

A brief suggests that L.D. 1594 is invalid because it does not meet the specificity requirements normally attaching to conveyances of public lands. We think the legislation meets whatever requirements are relevant under these circumstances. L.D. 1594 applies by its terms to all lands, formerly intertidal or submerged, that were filled as of October 1, 1975. Certainly the purpose of L.D. 1594 is to confirm titles to shore property on the basis of the readily identified situation existing on the face of the earth on that date. That specificity is all that is necessary to achieve the bill's purpose; given the difficulty of determining the natural high and low water marks for much of the Maine shore, that is all that is possible.

To illustrate our conclusion that L.D. 1594 passes constitutional muster as "reasonable for the benefit of the people," we wish to compare it with two other situations in which the judiciary has been called upon to pass on legislative conveyances of submerged properties. In *Illinois Central R.R. v. Illinois, supra*, the State of Illinois had granted to the Illinois Central Railroad a tract of over a thousand acres of submerged land off the Chicago waterfront. This tract comprised all of the Chicago harbor as well as adjacent submerged lands that would likely be included in the harbor. Four years later, the state repented of its action and revoked the grant. The United States Supreme Court upheld the revocation on the ground that the original grant had been invalid. The Court dwelt on the critical nature of the property involved, noting that the Chicago harbor handled a volume of traffic equal to that of the ports of New York and Boston combined. 146

U.S. at 454–55, 13 S.Ct. at 118–19. This entire harbor had been placed under the exclusive control of a single private corporation, to manage and develop or not develop as it saw fit, in its own interest. *Id.* The property was at that time submerged, available for public use, and in fact being so used. The prodigality of the grant was obvious, and while invalidating it the Court specifically and repeatedly stated that a grant under other circumstances might be valid—for example, where public rights in adjacent lands and waters were in no way impaired. *Id.* at 452, 455–56, 13 S.Ct. at 119.

Legislation much closer to L.D. 1594 was involved in the *1981 Mass. Opinion of the Justices, supra*. The Massachusetts Senate sought an advisory opinion on the validity of a proposed bill to release the Commonwealth's public trust rights to filled land along the Boston waterfront and in Back Bay. The legislation described a "1980 line" around the city of Boston; landward of this line, lands that had been intertidal or submerged had been entirely filled. With respect to this filled land the justices of the Massachusetts Supreme Judicial Court were unanimous in upholding the validity of the legislation, saying that

> we have no hesitancy in accepting the legislative conclusion that it is substantially in the public interest that such land be free from any claim of a public trust and any other vestigial interest of the Commonwealth.

*Id.* —— Mass. at ——, 81 Mass.Adv.Sh. at 1376, 424 N.E.2d 1092. We think the same applies to the filled lands that are the subject of L.D. 1594.

Having concluded that L.D. 1594 meets the constitutional standard of being "reasonable for the benefit of the people," we are still left with the further question, under the Legislative Powers Clause, whether that legislation nonetheless is repugnant to any other provision of the Maine or Federal Constitution. We think not. One brief urges that the public's interest in the filled

---

8. See n. 7 above.

lands that would be released by L.D. 1594 is one of the "natural, inherent and unalienable rights" guaranteed to all persons under the Maine Declaration of Rights, Me.Const. art. I, § 1. The Massachusetts Constitution has an "unalienable rights" clause functionally identical to Maine's; yet the *1981 Mass. Opinion of the Justices, supra,* refused to find the public trust rights in submerged or intertidal lands inalienable as a constitutional matter. The Massachusetts justices summarized the law as follows:

> The general view in this country is that constitutional considerations do not bar legislative grants of absolute rights in submerged lands, although a gross or egregious disregard of the public interest would not survive constitutional challenge.

*Id.* —— Mass at ——, 81 Mass.Adv.Sh. at 1370, 424 N.E.2d 1092. Our common historical and constitutional background leads us to agree with the Massachusetts justices that the release by L.D. 1594 of public rights in filled lands, provided that the release is reasonable for the public benefit under the Legislative Powers Clause, is not barred by any other constitutional prohibition. *See Opinion of the Justices, supra,* 118 Me. at 505, 106 A. at 868 (public rights in great ponds not "sacred and inalienable"; they "can be granted and conveyed, as they often have been, by the Legislature, which represents the people"). Of course, legislation representing "a gross or egregious disregard of the public interest" such as occurred in the *Illinois Central* case, *supra,* would be unconstitutional for failure to meet the reasonableness test of Maine's Legislative Powers Clause.

The Legislature passed L.D. 1594 in order to deal with a unique problem arising under circumstances novel in Maine. Our advisory opinion that the Legislature did not thereby exceed its constitutional powers should be recognized as being strictly limited to the special combination of five factors discussed above. The scope of this advisory opinion does not extend beyond advising the Governor as to the constitutionality of this particular legislation on its face.

After the enactment of L.D. 1594, if it becomes, law, the public trust rights to intertidal and submerged lands in their natural, unfilled state, remain unrestricted and unimpaired. Strict laws are already in place to assure that any filling or other development of the intertidal and submerged lands is consistent with the State's public trust responsibilities; and it is open to the Legislature or the people directly to enact any further laws and regulations they deem necessary to protect those public rights. Any release or limitation by the Legislature of the public trust rights in unfilled intertidal and submerged lands is and will be subject to judicial review of its reasonableness on the high and demanding standard that we have outlined earlier in this opinion.

We answer Question 3 in the negative.

We answer Question 4 also in the negative.

## QUESTIONS 1 and 2

■ Only subject to carefully confined conditions does the Maine Constitution give the Justices of the Supreme Judicial Court the extraordinary responsibility of rendering their opinion outside the context of any concrete, fully developed factual situation and without the benefits of adversary evidentiary and legal presentations. An advisory opinion, which represents the views of the individual Justices and is not the decision of the Supreme Judicial Court sitting as the Law Court, is constitutionally permissible only "on important questions of law, and upon solemn occasions." Me. Const. art. VI, § 3 (1965). Upon receiving a request for an advisory opinion from the Governor or either house of the Legislature, the "first duty [of each Justice] ... must be to determine whether the case is one in which the law allows the opinions of the Justices to be given." *Opinion of the Justices,* Me., 339 A.2d 483, 491 (1975). "[T]he boundaries set by the Constitution on our duty to furnish opinions are jurisdictional in nature and must be strictly observed in order to preserve the fundamental principle of the separation of the judicial from the executive and the legislative branches of

government." *1981 Mass. Opinion of the Justices, supra* —— Mass. at ——, 81 Mass. Adv.Sh. at 1382, 424 N.E.2d 1092, *quoting Answer of the Justices*, 362 Mass. 914, 917, 291 N.E.2d 598, 600 (1973).

■ We respectfully decline to answer Questions 1 and 2 because they request a declaration of existing law and as such do not rise to the level of a "solemn occasion." As our predecessors said five years ago, in declining to assess the constitutionality of a proposed law only cosmetically different from an existing statute it was intended to supersede, "no solemn occasion exists when the Justices are asked to give their opinions on the law which is already in effect." *Opinion of the Justices*, Me., 355 A.2d 341, 390 (1976). *See Opinion of the Justices*, Me., 339 A.2d 483 (1975).

In answering Questions 3 and 4, which do involve a solemn occasion, we necessarily have had to discuss the nature of the State's interest in filled lands as defined in L.D. 1594. However, we have no constitutional authority to go beyond the necessities of the solemn occasion and give a general elucidation of our individual views on the so-called public trust doctrine as applied to all present or former intertidal and submerged lands.

### QUESTION 5

■ We must also respectfully decline to answer Question 5. That question seeks an opinion on the prospective effect of the statute proposed by L.D. 1594. As such, it deals with a matter of future, not present, concern. The Justices have always declined to answer "tentative, hypothetical and abstract" questions, *Opinion of the Justices*, Me., 330 A.2d 912, 915 (1975), insisting instead that the subjects of their advisory opinions be of "instant, not past nor future, concern; things of live gravity." *Opinion of the Justices*, Me., 260 A.2d 142, 146 (1969), *quoting Opinion of the Justices*, 134 Me. 510, 513, 191 A. 487, 488 (1936).

Question 5 solicits our opinion on the effectiveness of a bill before it even becomes law. To express a view as to the future effect and application of proposed legislation would involve the Justices at least indi-

rectly in the legislative process. The separation of powers mandated by article III, section 2, of the Maine Constitution requires that we avoid any such intrusion on the functions of the other branches of government. The question of the effect of a statute and its future application is not within the constitutional power of the Justices to answer in an advisory opinion. *See 1981 Mass. Opinion of the Justices, supra* —— Mass at ——, 81 Mass.Adv.Sh. at 1381, 424 N.E.2d 1092.

Respectfully submitted:
VINCENT L. McKUSICK
EDWARD S. GODFREY
DAVID A. NICHOLS
DAVID G. ROBERTS
GENE CARTER