STATE OF MAINE

KNOX, ss.

STATE OF MAINE
Knox. S.S., Clerks Office
SUPERIOR COURT

APR 2 2001

RECEIVED AND FILED
Susan Guillette, Clerk

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. CV-99-059
JRA - KNO - 4/2/2001

CUSHING NATURE and
PRESERVATION CENTER,

      Plaintiff

      v.

INHABITANTS OF THE
TOWN OF CUSHING, *et al.*,

      Defendants

**DECISION AND ORDER**

## I.    Introduction.

In this case, the plaintiff, Cushing Nature and Preservation Center (CNPC), has brought a complaint under the Declaratory Judgments Act, 14 M.R.S.A. § 5951 *et seq.*, asking this court to declare that it was exempt from property tax assessments imposed by the defendant Town of Cushing (Cushing or the Town) for tax years 1998 and 1999. CNPC also asks this court to order reimbursement of the taxes it paid to Cushing for those two years and to permanently enjoin the defendant from assessing property taxes on its property.

CNPC has filed a motion for summary judgment, claiming that on the record provided there is no genuine issue as to any material fact and that, therefore, it is entitled to a judgment on the complaint as a matter of law. M.R. Civ. P. 56(c). The defendant opposes the motion and asks the court to enter summary judgment in its favor on this record as M.R. Civ. P. 56(c) permits.

In order to prevail on its motion and defeat the defendant's request for judgment in its behalf, CNPC is "required to produce evidence sufficient to resist a motion for a directed verdict if it produced at trial nothing more than [is] before the court on its motion for a summary judgment." *Keyes Fibre Company v. Lamarre,* 627 A.2d 213, 214 (Me. 1992). Conversely, the defendant is entitled to summary judgment if "it is clear that the defendant would have been entitled to a judgment as matter of law at a trial if the plaintiff produced no more evidence than was before the court on the motion for a summary judgment." *Town of Lisbon v. Thayer Corp.,* 675 A.2d 514, 517 (Me. 1996). "To avoid a judgment as a matter of law for a defendant, a plaintiff must establish a prima facie case for each element of [its] cause of action." *Id.*

## II. Facts.

In support of their respective positions, the parties have filed lengthy Statements of Material Facts with an extensive record. Unfortunately, these fail to meet the direction of M.R. Civ. P. 7(d)(1) which prescribes "a . . . short and concise statement of the material facts . . ." *Id.* Thus, the court has been required to not only distill these to their essential significance but also to ignore their use as a medium for advocacy best left to a memorandum of law. For this reason, the court will recite the material facts not in dispute in the record without the irrelevant detail and unnecessary prose that these accompany them, as follows:

2

- CNPC was incorporated on October 9, 1997, as a non-profit corporation. According to its Articles of Incorporation, CNPC is organized for the following purposes:

> The corporation is organized for one or more of the purposes as specified in Section 501(c)(3) of the Internal Revenue Code of 1986, including to own, operate and preserve land as a nature center and/or center for programs for environmental education, and shall not carry on any activities not permitted to be carried on by an organization exempt from federal income tax under IRC 501(c)(3) or corresponding provisions of any subsequent tax laws.

It has received a preliminary determination from the IRS that it is exempt from federal income tax.

- Since February of 1998, CNPC has been the owner of two lots of land in Cushing, denominated as lots 9 and 22. Although separated, together they amount to 400 acres. Lot 9 has several buildings. This land was acquired from Advanced Medical Research Foundation (AMRF) which in turn had obtained the property by gift in 1981 as to lot 22 and 1985 as to lot 9.

- In 1998 Cushing assessed taxes on these lots in the sum of $18,245.36, in 1999, $18,981.06.

- There are four officers of CNPC and a three person board of directors, all of whom receive no compensation for their services. In 1998 and 1999, CNPC had a part-time manager who was also unpaid. CNPC had a caretaker who was paid $25 per month, plus additional sums for special projects. Neither person received any pecuniary profit from CNPC's operations in 1998 and

3

1999. The directors of CNPC and AMRF are the same and Dr. Nile Albright is the president of both entities. The manager is also an AMRF employee.

- On lot 9 there is a three bedroom, two story farmhouse and a large two-story barn which CNPC calls its Nature Center. There are also two small sheds and a dock in disrepair.

- The property is open to public use every day except that clammers may not use it to access the shore, clamming is prohibited, and the entrance roads to both lots are purposely kept in rough shape to discourage driving instead of walking. The farmhouse, sheds and dock are unavailable for public use.[1]

- The barn is kept locked at all times except when CNPC orders the caretaker to unlock it for special functions.

- The barn and the farmhouse are in essentially the same condition as when the property was donated to AMRF and have not been improved except for routine maintenance. The barn has an office or administrative area on its upstairs floor.

- There is a phone in the farmhouse with an extension in the barn. There is no answering machine and if no one is present, the call is routed to Boston. Neither the farmhouse, nor the barn, has had regular electric service since July of 1998.

---

[1] The parties dispute the extent to which CNPC's property is used by the public outside of formal programs. From the record provided, it is impossible to resolve this debate. It can probably be said, however, that some walkers and cross-country skiers use this property from time to time.

4

In 1998 and 1999, CNPC operated an entity called the Cushing Nature Center Science Camp for Girls (CNCSCG) on the grounds of CNPC.[2] It is designed to promote interest and enthusiasm in science by girls, to develop self-esteem and leadership, and for them to meet women scientists and role models. The camp each year was six days long and approximately 20 girls attended. It had a director and five in staff who were paid from $550 to $1,500 as stipends. Guest instructors also provided additional instruction. The camp conducted its activities on both lots. It is an overnight camp with the girls sleeping in donated tents or in the barn. About half the campers come from the local Cushing/Thomaston area and the other half from Salem, Massachusetts. The camp is funded by grants and donations with campers paying tuition of $50 in 1998 and 1999. MSAD#50, which includes Cushing and Thomaston, and the Salem school system support the camp by recruiting staff, sharing supplies and disseminating information to potential campers. The camp receives three or four scholarship requests each year which CNPC honors with the result that about 20% of the campers receive a scholarship. CNCSCG does not receive its funding directly from CNPC, and paid CNPC $3,000 in 1998 and $3,200 in 1999 as "maintenance" payments for the buildings and grounds

_____

[2] The town disputes this fact in that it maintains that CNPC neither conducts nor operates CNCSCG. Indeed, it has cited facts in the record which would support a finding that the camp is somewhat independent of CNPC and that the latter simply provides a venue for the camp's operations. While this is a material fact in dispute, and the court at this juncture is neither to serve as a factfinder, *Casco Northern Bank, N.A. v. Edwards*, 640 A.2d 213, 215 (Me. 1994), nor to make findings favoring the movant, for purposes of this decision and order only, the court will accept the plaintiff's characterization of this relationship.

owned by CNPC. These maintenance payments represent approximately 25% of CNCSCG's budget. In 1998 and 1999, the director of the camp put the funding together for the camp.

- In the summers of 1998 and 1999 MSAD#50 ran a four-day science camp. This was a day camp administered by MSAD#50 for its students as part of the district's summer program, most of which is conducted at an elementary school. The program is funded by the State, and CNPC donated $480 and $550 respectively to the program for 1998 and 1999 and made its property available for the district's use for these two science camps. MSAD#50 was required to execute a written release so that CNPC could not be held liable for the former's activities. MSAD#50 was also encouraged to provide its own bathrooms, supplies, food, and cellular phones. MSAD#50 was also not to use the buildings on CNPC's property, unless it rained in which case it could use the "conference center," sometimes called the barn or "the nature center."

- For three or four days in 1998, and perhaps 1999, MSAD#50 also conducted a three to four day teacher training program for teachers from that district and others.[3] The teachers brought their own materials to the program.

- Over the weekend of September 26-28, 1998, Knox County Boy, Girl and Cub Scouts used the property for camping. The scouts were to provide their own shelter, bathrooms, supplies, food, and phone.

---

[3] The Town disputes that this training program occurred in 1999.

- Over the weekend of May 21-23, 1999, the Girl Scouts conducted a camporee on CNPC's property. They had to provide their own sanitary facilities, supplies, food, and phone.

- On June 11, 1999, a fifth grade class from the Thomaston Grammar School took a one-hour nature hike on the property.

- The scouting programs and the fifth grade class could not use the "conference center" unless it rained and received no financial support from CNPC. Each of them conducted its own program.

- Judy Markowsky, a naturalist, conducted an evening nature walk on the property on August 4, 1999, called "Noises of the Night." She also conducted three walks in 1998 and 1999 on CNPC property called "Secrets of the Forest." At least two other naturalists have conducted "walks" on the property. Dr. Albright may have conducted tours in 1998 and 1999 as well.[4]

- Maine Medical Center used the property in 1998 and 1999 as part of a study of a larger area in Cushing to determine the relationship between deer density and Lyme disease.

- In 1998, the Cushing Historical Society marked burial sites of Native Americans and early settlers on CNPC land.

## III. Discussion.

> [A]ny institution which by its charitable activities relieves the government of part of [its] burden is conferring a pecuniary benefit

---

[4] The Town argues that the record supplied by the plaintiff does not support a finding that Dr. Albright conducted those nature walks in tax years 1998 and 1999.

7

upon the body politic, and in receiving exemption from taxation it is merely being given a 'quid pro quo' for its services in providing something which otherwise the government would have to provide.

*Episcopal Camp Foundation v. Town of Hope*, 666 A.2d 108, 110 (Me. 1995) (*quoting YMCA of Germantown v. City of Philadelphia*, 323 Pa. 401, 187 A. 204, 210 (1936)).

The power to determine what property is entitled to an exemption, however, is exclusively the Legislature's. *Alpho Rho Zeta v. Inhab. of City of Waterville*, 477 A.2d 1131, 1137 (Me. 1989). In this regard, it has enacted section 652 of Title 36 which reads in pertinent part at subparagraph (1)(A) as follows:

§ 652. Property of institutions and organizations

The following property of institutions and organizations is exempt from taxation:

1.  Property of institutions and organizations.

A.    The real estate and personal property owned and occupied or used solely for their own purposes by benevolent and charitable institutions incorporated by this State. Such an institution may not be deprived of the right of exemptions by reason of the source from which its funds are derived or by reason of limitation in the classes of persons for whose benefit such funds are applied.

While this text may be read as a broad authorization for property tax exemptions to benevolent and charitable institutions, case law suggests otherwise. Indeed, our Law Court has held that the burden of establishing the exemption falls on the institution which seeks it which cannot successfully do so unless its request is "unmistakably within the spirit and intent" of the claimed exemption. *Silverman v. Town of Albion*, 451 A.2d 103, 105 (Me. 1982). Exemptions are thus strictly construed because, "such special privileges are in conflict with the universal

8

obligation of all to contribute a just proportion toward the public burdens." *Episcopal Camp., id.* (*quoting City of Bangor v. Rising Virtue Lodge No. 10, Free & Accepted Masons,* 73 Me. 428, 433 (1882)). Thus, our jurisprudence has recognized a deep-seated policy that taxation is the rule and tax exemption is the exception. *Pentecostal Assembly of Bangor v. Maidlow,* 414 A.2d 891, 893 (Me. 1980). Tax exemption statutes are therefore to be strictly construed, "which means that all doubt and uncertainty as to the meaning and legislative intendment must be weighed against the exemption." *Silverman v. Town of Albion, id.*

Applying this guidance from our Law Court to the undisputed facts before this court, including the plaintiff's contested assertion that it operates the CNCSCG, it must be concluded that the plaintiff has not established that it is entitled to the special privilege of tax exemption and that any doubt in this regard must be weighed against it. *Silverman v. Town of Albion, id.*

Assuming, without deciding, that CNPC did have an operational role in CNCSCG in 1998 and 1999, that was its only working charitable and benevolent activity. Indeed, that activity amounted to six days a year only, not including planning time, overseen by a temporary staff who are paid stipends for their brief work. The camp has no office, no buildings, assets or resources that are uniquely its own, and pays CNPC from its revenue a fee to maintain the latter's property. Such a temporary quasi-independent activity of short duration cannot be relied on by the plaintiff as a basis to secure a tax exemption. Indeed, even the attendees of the camp come from only two discreet geographical areas and thus the camp does not benefit

9

an "indefinite number of persons," *Johnson v. South Blue Hill Cemetery Ass'n*, 221 A.2d 280, 287 (Me. 1966), nor does it relieve either state or local government of their burdens. *YMCA Germantown, id.*[5]

All the rest of the plaintiff's use of its land in Cushing is only passively related to charitable or benevolent purposes. While it is true that it appears to be generous to the public and other charitable organizations such as the Scouts, its role in this regard is simply to allow them to use the land. Even that use has restrictions. The plaintiff's buildings may not be used without prior approval or except in bad weather, and guests must release the plaintiff from liability and provide their own shelter, food, sanitation facilities, and phone, even though CNPC has all these resources on site. These facts, even those in dispute as to the operation of CNCSCG, simply do not compare to cases involving exemptions permitted by the Law Court for camps or like activities. *See, e.g., Episcopal Camp, id.* (". . . an organized and professional program . ."); *Salvation Army v. Town of Standish*, 1998 ME 75 ¶ 2, 709 A.2d 729 (Me. 1998)) (three residential buildings used for campers and staff, tennis courts, fishing pier, etc.); *Camp Emoh Assoc. v. Inhabitants of Lyman*, 132 Me. 67, 69, 166 A.2d (1933) (two month camp for 250 children).

As the defendant has argued, quantity or extent of activity does matter. As CNPC's predecessor learned, the use of property that was limited both spatially and temporally as to its benevolent purposes can not qualify for a tax exemption.

---

[5] That the plaintiff intends to or has run a short science camp for boys after the tax periods in question adds little to their case. *See* Plaintiff's Statement of Material Facts, ¶ 16.

10

*Advanced Med. Research Found v. Town of Cushing*, 555 A.2d 1040, 1042 (Me. 1989). Were it otherwise, any owner of a large tract of property could use it for short periods for a summer camp and allow public access at other times and thereby excuse itself from taxation. Legislative intendment and the guidance of the Law Court do not contemplate such a result.

As a second, but related argument, the plaintiff asserts that it is entitled to exemption from the Town's property tax because it preserves land for public recreation, access, and use. This aspect of its existence as a charitable organization, it claims, constitutes maintenance "of public works" because the State also sets aside land for conservation purposes for the public good. Plaintiff's Memorandum, p. 13. That being so, an entity such as CNPC which does the same, and thereby relieves the government of this task, should be held exempt from taxes. *Episcopal Camp, id.* at 110. This argument, however, fails for several reasons in addition to the rationale cited, infra, which concluded that CNPC is not entitled to an exemption by virtue of its connections to CNCSCG and its hospitality to other benevolent organizations.

First, if a charitable trust has a purpose contrary to public policy, it is invalid and may not be held exempt from property taxes. *Holbrook Island Sanctuary v. Inhabitants of the Town of Brooksville*, 214 A.2d 660, 666 (Me. 1965). Here, on the one hand CNPC claims that its land is dedicated to public use for recreation and the enjoyment of nature, but on the other hand bars clammers, obviously members of the public, from access to the land and its clam flats which, apparently, make up the

11

saltwater frontage of this property. *See* Defendants' Responses to Plaintiff's Statement of Material Facts, ¶ 70; Albright Dep., pp. 150-151.

It is well-established Maine law that the public enjoys an easement over intertidal land for the purposes of fishing, fowling, and navigation. *Bell v. Town of Wells*, 557 A.2d 168, 173 (Me. 1989). Fishing includes clamming. *Id., State v. Leavitt*, 105 Me. 76, 72 A. 875 (1909). Any legislation which gives up such public rights must meet "a particularly demanding standard of reasonableness." *Opinion of the Justices*, 437 A.2d 597, 607 (Me. 1981). Title 36 M.R.S.A. § 652, in allowing exemptions from property tax for benevolent and charitable institutions, does not purport to cede the public's rights to any intertidal land even when owned by a charitable corporation. That being so, it is unnecessary to evaluate whether such a surrender of rights is reasonable as it cannot be said to have ever occurred. Accordingly, it must be concluded that the public, including clammers, have the right to harvest the plaintiff's intertidal lands, and the latter has no right to interfere with this activity or to selectively exclude clammers from access to its property which it represents as open to the public every day. To do so is contrary to public policy and disqualifies the plaintiff as a benevolent and charitable institution to the extent that its uses of its land is contrary to public purpose. *Holbrook Island Sanctuary v. Inhabitants of the Town of Brooksville, id.*

If it is CNPC's argument that it has closed its flats to conserve clams, this, too, is contrary to Maine law as it is the State's right, not that of a private property owner, to conserve, protect and regulate its marine resources. *See, e.g., State v.*

12

*Richardson*, 285 A.2d 842 (Me. 1972); *State v. Alley*, 274 A.2d 718, 721 (Me. 1971) (*citing with approval State v. Leavitt, id.*). Moreover, no law allows the State to cede this responsibility to a charitable organization which purports to control this public resource. All this being so, CNPC cannot as a matter of law claim an exemption from taxation for its land on a basis that it is made available for public use and conservation as it does, so in part, in a manner contrary to Maine law. *Holbrook Island Sanctuary v. Inhabitants of the Town of Brooksville, id.*

Second, the court concurs with the defendant's position that the Legislature has already provided for tax relief to those landowners who wish to dedicate their land to conservation, public recreation, game management or wildlife preservation as "open space land." 36 M.R.S.A. §§ 1101 *et seq.* (1990, Supp. 2000). Such land may qualify for up to a 95% reduction in property taxes if it meets certain statutory requirements. 36 M.R.S.A. § 1106-A (Supp. 2000). It would be an incongruent result if a landowner could obtain a full property exemption under one statute but no more than a 95% exemption under another for the same dedicated use. Such a result is avoided by a standard rule of statutory construction, "that a statute dealing with a subject specifically prevails over another statute dealing with the same subject generally." *Butler v. Killoran*, 1998 ME 147, ¶ 11, 714 A.2d 129, 133. Thus, the more specific statute which provides tax relief for property owners who wish to dedicate their land for conservation purposes, 36 M.R.S.A. § 1101 *et seq.*, must prevail over the more generalized tax exemption statute for charitable or benevolent organizations which may, pursuant to their charitable purposes, use

13

their land and enjoy exemption for other or restricted purposes which may include conservation. That being so, the plaintiff cannot rely on its nonprofit, charitable status to exempt its land from Cushing's property tax because it is being used for conservation or other "open space" uses via 10 M.R.S.A. § 362 because the Legislature has enacted a more specific legislative provision for this purpose for which the plaintiff apparently did not qualify in 1998 and 1999.

## IV. Conclusion.

Based on the foregoing, the clerk will make the following entries:

Plaintiff's Motion for Summary Judgment is DENIED; Summary Judgment is to be ENTERED for the Defendants. The court DECLARES that the Plaintiff, Cushing Nature and Preservation Center, is not entitled to property tax exemption for tax years 1998 and 1999.

So ordered.

Dated: March 30, 2001

John R. Atwood
Justice, Superior Court

14