**OPINION OF THE JUSTICES OF THE SUPREME JUDICIAL COURT Given Under the Provisions of Section 3 of Article VI of the Constitution.**

Supreme Judicial Court of Maine.

Questions Propounded by the Governor in a Communication Dated June 20, 1989.
Answered June 28, 1989.

## COMMUNICATION FROM GOVERNOR PROPOUNDING QUESTION

June 20, 1989

To The Honorable Justices of the Supreme Judicial Court:

Believing that this legislation and its presentation for my official action raise important questions of law upon a solemn occasion within the meaning of Article VI, Section 3 of the Constitution of Maine,

I, John R. McKernan, Jr., Governor of the State of Maine, pursuant to the authority conferred upon me by Article VI, Section 3 of the Constitution of Maine, respectfully request the opinion of the honorable justices of the Supreme Judicial Court upon the questions of law presented herein.

## STATEMENT OF FACTS

On June 19, 1989 the House of Representatives and the Senate of the State of Maine presented to me, for my approval or return, duly enacted L.D. 1756, "AN ACT to Ensure a Cooling-off Period Before the Hiring of Permanent Replacement Workers During a Labor Dispute." I must act upon this legislation within ten days of presentment or L.D. 1756 will become law pursuant to Article IV, Part 3, Section 2 of the Constitution of Maine.

I believe that L.D. 1756 raises important questions of law regarding the permissible scope of our state's regulatory authority under both the National Labor Relations Act (NLRA) and the Constitution of Maine

in labor/management relations. This is the fourth bill enacted in the past two years to raise these questions, all of which I rejected in part because of these concerns, and a fifth is currently pending before the Legislature. The persistence of these questions, the importance of their effect on labor/management relations in this state, and their present live gravity given that L.D. 1756 awaits my immediate official action require me to seek the guidance of this Court so that I may fulfill my sworn duty to support the Constitutions of the State of Maine and of the United States. *Opinion of the Justices*, 437 A.2d 597, 604 (Me. 1981).

This legislation, if enacted into law, would limit the ability of employers to fill positions vacated due to a labor dispute. The United States Supreme Court has expressly recognized the right of employers under the NLRA to hire replacement workers to fill such vacated positions. *Belknap v. Hale*, 463 US 491, 493 [103 S.Ct. 3172, 3174, 77 L.Ed.2d 798] (1983); *National Labor Relations Board v. McKay [Mackay] Radio & Telegraph Co.*, 304 US 333, 345 [58 S.Ct. 904, 910, 82 L.Ed. 1381] (1938); 29 USCA § 151 et seq. (1973 & Supp.1989). Because the central tenet of the NLRA is to preserve the integrity of the collective bargaining process by allowing this right to compete freely against the economic leverage of the employees' right to strike, state laws that have had the effect of limiting this right of employers have been held to be preempted by the NLRA. *Chamber of Commerce of the United States v. State of New Jersey* [89 N.J. 131], 445 A.2d 353 (N.J.1982) ("local concern and responsibility" exception to the preemption doctrine does not apply to a law that directly affects a federally protected right like an employer's right to hire replacements); *Illinois v. Federal Tool and Plastics, Division of U.L.A.* [*V.C.A.*, 62 Ill.2d 549], 344 N.E.2d 1 (Ill.1975); *Michigan Chamber of Commerce v. Michigan*, 115 LRRM 2887 (Mich. Cir.Ct.1984); Note, Federal Preemption: State Strikebreaking Laws and National Labor Policy, 30 Cath.U.L.Rev. 521 (1981). *See also, Director of Bureau of Labor*

*Standards v. Fort Halifax Packing Co.*, 510 A.2d 1054, 1060 fn. 10 (Me.1986).

Believing that the existence of this law and the circumstances referenced above render this occasion solemn within the meaning of Article VI, Part 3, I respectfully request the opinion of the honorable justices of the Supreme Judicial Court on the following questions of law:

## QUESTIONS OF LAW

1. Is the State of Maine preempted under federal law, and specifically under the National Labor Relations Act, 29 U.S.C.A. § 151 et seq. (1973 & Supp.1989), from imposing the restrictions on the hiring practices defined in L.D. 1756?

2. Would L.D. 1756, if enacted into law, be invalid as exceeding the authority of the Legislature under Article IV, Part 3, Section 1 of the Maine Constitution to make and establish all reasonable laws and regulations for the defense and benefit of the people of this State, not repugnant to the Constitutions of the State of Maine or of the United States?

Respectfully submitted,
(s) John R. McKernan, Jr.
John R. McKernan, Jr.
Governor

**STATE OF MAINE**

**IN THE YEAR OF OUR LORD**

**NINETEEN HUNDRED AND EIGHTY–NINE**

H.P. 1259—L.D. 1756

**An Act to Ensure a Cooling-off Period before the Hiring of Permanent Replacement Workers during a Labor Dispute**

**Be it enacted by the People of the State of Maine as follows:**

26 MRSA c. 7, sub-c. VII–A is enacted to read:

SUBCHAPTER VII–A

## HIRING OF REPLACEMENT WORKERS DURING A LABOR DISPUTE

**§ 857. Delay in hiring of permanent replacement workers**

1. **Hiring of permanent replacement workers delayed.** If the employees of an employer agree to and comply with the conditions of subsection 2, the employer may not hire any person as a permanent employee to perform the tasks normally done by a striking employee until the 45th day after the strike commences. The employer may hire temporary replacement workers or use other employees who were employed by that employer before the commencement of the strike to perform the tasks normally done by striking employees.

2. **Application; conditions.** Subsection 1 does not apply to any employer unless the employees of that employer agree, by a recorded majority vote, to comply with the following conditions.

    A. The employees must conduct a recorded vote authorizing the strike before the strike commences.

    B. The employees must conduct a subsequent recorded vote between the 40th and 45th day after the strike commences to accept or reject the employer's current contract offer at that time.

---

In House of Representatives, June 19 1989 Read twice and passed to be enacted.

[Signature] Speaker

---

In Senate, June 19 1989 Read twice and passed to be enacted.

[Signature] President

---

Approved _____ 1989

_____ Governor

**An Act** to Ensure a Cooling-off Period before the Hiring of Permanent Replacement Workers during a Labor Dispute

## ROOMS OF HOUSE COMMITTEE ON ENGROSSED BILLS

AUGUSTA June 19, 1989

The accompanying Act, the title of which is written above, has been truly and strictly engrossed.

    (s) Jean S. Blair Clerk
    For the Committee

## ROOMS OF SENATE COMMITTEE ON ENGROSSED BILLS

AUGUSTA June 19, 1989

The accompanying Act, the title of which is written above, has been truly and strictly engrossed.

    (s) Jean S. Blair Clerk
    For the Committee

## ANSWERS OF THE JUSTICES

To His Excellency, John R. McKernan, Jr., Governor of Maine:

In compliance with the provisions of section 3 of article VI of the Constitution of Maine, we, the undersigned Justices of the Supreme Judicial Court, have the honor to submit the following responses to the questions you propounded on June 20, 1989. The constitutionality of a bill pending before the Governor awaiting his signature presents an "important question of law" on a "solemn occasion." *See Opinion of the Justices*, 437 A.2d 597, 604 (Me.1981).

*Question 1.* Is the State of Maine preempted under federal law, and specifically under the National Labor Relations Act, 29 U.S.C.A. §§ 151 *et seq.* (1973 & Supp.1989), from imposing the restrictions on the hiring practices defined in L.D. 1756?

We answer Question 1 in the affirmative. As the Law Court observed in *Director of Bureau of Labor Standards v. Fort Halifax Packing Co.* (*Fort Halifax*), 510 A.2d 1054, 1060 (Me.1986), *aff'd sub nom. Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987), the United States "Supreme Court has dis-

cerned two different principles of preemption [of state action] that flow from the [National Labor Relations Act (NLRA)]." Under the second of those principles we believe it clear that the Supreme Court would hold that L.D. 1756 is preempted by federal law and is therefore repugnant to the Supremacy Clause (art. VI) of the Constitution of the United States.

■ Under the first preemption principle, state regulation of the collective bargaining process is presumptively preempted if it concerns conduct that is expressly or arguably either prohibited or protected by sections 7 and 8 of the NLRA. *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 245, 79 S.Ct. 773, 779, 3 L.Ed.2d 775 (1959). The *Garmon* preemption principle protects from state interference the primary jurisdiction of the National Labor Relations Board, acting under congressional direction, to construe and apply the "complex and interrelated federal scheme of law, remedy, and administration," thereby promoting uniformity in national labor law. *Id.* at 243, 79 S.Ct. at 778.

■ The second preemption principle, known as the *Morton–Machinists* doctrine after the leading cases propounding it,

> is based on implied congressional intent to leave certain conduct that is neither protected nor prohibited by either Section 7 or 8 of the act unrestricted from most forms of regulation *by either the NLRB or the states.*

*Fort Halifax*, 510 A.2d at 1060 (emphasis added) (citing *Teamsters Local 20 v. Morton (Morton)*, 377 U.S. 252, 84 S.Ct. 1253, 12 L.Ed.2d 280 (1964), and *Local 76, International Ass'n of Machinists v. Wisconsin Employment Relations Comm'n (Machinists)*, 427 U.S. 132, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976)). In the NLRA and associated federal laws, Congress has set up a framework for collective bargaining by which employers and employees are prohibited from using certain weapons of economic pressure, while other weapons are left "unregulated and to be controlled by the free play of economic forces." *Machinists*, 427 U.S. at 144, 96 S.Ct. at 2555. "In selecting which forms of economic

pressure should be prohibited ..., Congress struck the 'balance ... between the uncontrolled power of management and labor to further their respective interests'...." *Morton*, 377 U.S. at 258–59, 84 S.Ct. at 1258. That balance may not be disturbed by action of either the NLRB or the States.

The right of an employer to continue his operations in the face of a strike by hiring replacement workers is one of the "weapons of economic pressure" that Congress left "unregulated and to be controlled by the free play of economic forces." Under federal law, the Supreme Court decided over fifty years ago that an employer whose employees have gone on economic strike has a right to hire permanent replacement workers "to protect and continue his business." *NLRB v. Mackay Radio & Tel. Co.*, 304 U.S. 333, 345, 58 S.Ct. 904, 911, 82 L.Ed. 1381 (1938). *See also Belknap, Inc. v. Hale*, 463 U.S. 491, 493, 103 S.Ct. 3172, 3174, 77 L.Ed.2d 798 (1983) ("Where employees have engaged in an economic strike, the employer may hire permanent replacements whom it need not discharge...."). That well-established right was again reaffirmed at the current term in *Trans World Airlines, Inc. v. Independent Federation of Flight Attendants*, 489 U.S. 426, ——, 109 S.Ct. 1225, 1232–33, 103 L.Ed.2d 456, 468–69 (1989), which stated:

> That the prospect of a reduction in available positions may divide employees and create incentives among them to remain at work or abandon a strike before its conclusion is a secondary effect fairly within the arsenal of economic weapons available to employers during a period of self-help.

■ Upon a specified vote by striking employees, L.D. 1756 would prohibit their employer from hiring permanent replacement workers for a period of 45 days after the start of the strike. The proposed law thus would disrupt the balance struck by Congress between the weapons of economic pressure available to the employer and the striking employees. L.D. 1756 is made no less disruptive of that balance by its

provision permitting the employer to hire temporary replacements during the 45–day period; the employer's offer of only short-term jobs under strike conditions is unlikely to attract the kind of employees needed "to protect and continue his business." *See Belknap, Inc. v. Hale,* 463 U.S. at 514, 103 S.Ct. at 3185.

The preemption of L.D. 1756 by the NLRA is illustrated by the fact situations of the leading Supreme Court cases that gave their names to the *Morton–Machinists* preemption principle. In *Morton,* 377 U.S. 252, 84 S.Ct. 1253, the Supreme Court held unconstitutional the action of the State of Ohio in barring a union's use in a labor dispute of a secondary boycott of a type neither protected nor prohibited by the NLRA. In *Machinists,* 427 U.S. 132, 96 S.Ct. 2548, the Court struck down an attempt by the State of Wisconsin to prevent unionized employees from using a concerted refusal to work overtime as an economic weapon in their collective bargaining of a new contract with their employer. In *Machinists* the Supreme Court said of Wisconsin's intervention on the side of the employer, "it is clear beyond question that Wisconsin '[entered] into the substantive aspects of the bargaining process to an extent Congress has not countenanced.'" *Id.* at 149, 96 S.Ct. at 2557 (quoting *NLRB v. Insurance Agents,* 361 U.S. 477, 498, 80 S.Ct. 419, 432, 4 L.Ed.2d 454 (1960)). It is equally clear that if L.D. 1756 should become law, Maine would thereby enter into the substantive aspects of the bargaining process to an extent Congress has not countenanced. For other cases applying the *Morton–Machinists* preemption principle, see *Golden State Transit Corp. v. City of Los Angeles,* 475 U.S. 608, 106 S.Ct. 1395, 89 L.Ed.2d 616 (1986) (city council may not intrude into collective bargaining process by refusing to renew taxi franchise until employer settles labor dispute); *NLRB v. Insurance Agents,* 361 U.S. at 490, 80 S.Ct. at 427 (NLRB may not regulate "choice of [lawful] economic weapons that may be used as part of collective bargaining").

Only two state supreme court decisions have passed on the validity of state stat-utes restricting the right of an employer to hire replacement workers during a strike, and both have held their statutes to be preempted by federal labor law. *Chamber of Commerce of the United States v. New Jersey,* 89 N.J. 131, 445 A.2d 353 (1982); *People v. Federal Tool & Plastics,* 62 Ill.2d 549, 344 N.E.2d 1 (1975). The preempted New Jersey statute prohibited the importation from outside New Jersey of replacement workers for a struck employer. *See* 89 N.J. at 138, 445 A.2d at 356. The preempted Illinois statute required any advertisement seeking replacements for striking employees to contain a notice of the existence of the strike. *See* 62 Ill.2d at 550, 344 N.E.2d at 2.

■ Neither of the two limited exceptions that have been recognized in federal labor law preemption can save L.D. 1756. The prohibition for 45 days of the hiring of permanent replacement workers is hardly "a merely peripheral concern of the Labor Management Relations Act" (*San Diego Building Trades Council v. Garmon,* 359 U.S. at 243, 79 S.Ct. at 779); rather it goes to the core of the collective bargaining process. In this respect L.D. 1756 is quite different from state action establishing generally applicable minimum substantive labor standards such as those involved in both *Fort Halifax,* 482 U.S. at 20–21, 107 S.Ct. at 2222 (severance pay on plant closings), and *Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 754–55, 105 S.Ct. 2380, 2396–97, 85 L.Ed.2d 728 (1985) (minimum mental health benefits). And on its face, L.D. 1756 contradicts any notion that it in any significant way is an anti-violence regulation "touch[ing] interests so deeply rooted in local feeling and responsibility that, in the absence of compelling Congressional direction, we could not infer that Congress had deprived the States of the power to act." *Garmon,* 359 U.S. at 244, 79 S.Ct. at 779. Any possible effect L.D. 1756 might remotely have to reduce violence is minor compared to its direct operative consequence of shifting the economic balance between the two sides to a labor dispute. The 45–day "cooling-off" period that would be imposed by L.D. 1756

is precisely the kind of state action "to set ... time limits on negotiations or economic struggle" that the Supreme Court disapproved of in *Golden State Transit Corp. v. City of Los Angeles*, 475 U.S. at 616, 106 S.Ct. at 1399.

*Question 2.* Would L.D. 1756, if enacted into law, be invalid as exceeding the authority of the Legislature under Article IV, Part 3, Section 1 of the Maine Constitution to make and establish all reasonable laws and regulations for the defense and benefit of the people of this State, not repugnant to the Constitutions of the State of Maine or of the United States?

Since federal law preempts the subject matter of L.D. 1756, thereby rendering it repugnant to the Supremacy Clause (art. VI) of the Constitution of the United States, our answer to Question 2 is also in the affirmative. The further question whether L.D. 1756 would be a valid exercise of state legislative authority in the absence of federal preemption is academic and therefore for present purposes not an important question of law.

Dated: June 28, 1989.

VINCENT L. McKUSICK,
Chief Justice

DANIEL E. WATHEN

CAROLINE D. GLASSMAN

ROBERT W. CLIFFORD

SAMUEL W. COLLINS, JR.
Associate Justices

ROBERTS and HORNBY, JJ., are out of the state and unable to respond.