In re CARLETON WOOLEN
MILLS, Debtor.

Frank A. Russell, et al.,
Plaintiffs/Appellants,

v.

Allied Textile Companies, PLC,
Defendant/Appellee.

No. 02–CV–12–B–C.
Bankruptcy No. 00–10214.
Adversary No. 00–1073.

United States District Court,
D. Maine.

July 17, 2002.

Donald F. Fontaine, Jonathan S.R. Beal, Fontaine & Beal, P.A., Portland, ME, for appellants.

U. Charles Remmel, II, Kelly, Remmel & Zimmerman, Portland, ME, for Allied Textile Companies, PLC.

Rufus E. Brown, Brown & Burke, Portland, ME, for PJ Perrino, trustee.

## MEMORANDUM OF DECISION AND ORDER

GENE CARTER, District Judge.

The United States Bankruptcy Court for the District of Maine entered an order granting summary judgment in favor of Allied Textile Companies Limited ("Allied" or "Defendant/Appellee") and dismissing the above-captioned adversary proceeding brought by former employees of Carleton Woolen Mills, Inc. ("Carleton"). *See* Order Granting Allied Textile Companies Limited's Motion for Partial Summary Judgment, January 9, 2002 (hereinafter "January Order"). Frank A. Russell, *et al.* ("Plaintiffs/Appellants") appeal, arguing that the bankruptcy court committed reversible error in denying severance pay under the Maine Severance Pay statute (hereinafter "Statute"), 26 M.R.S.A. § 625–B, to employees who lost their employment in 1998, 1999, and 2000 at the Carleton plant. When former Carleton employees commenced suit against Allied

seeking severance pay, the bankruptcy court certified the following two classes:

> All non-unionized (management, sales, clerical, design, and others) employees of Carleton Woolen Mills who (1) were employed in either Winthrop or Gardiner in the State of Maine or in New York City during 1998 or 1999; (2) worked for a period of at least three years; (3) lost their employment because of the termination of the facilities in Maine; and (4) had no collective bargaining contract with their employer for the payment of severance.

> All persons who were employed at the Carleton Woolen Mills in Winthrop, Maine, during 1998 or 1999, under a collective bargaining agreement, and who were separated from employment at Carleton as a result of the closure of the Mill (or any part of it) and who had been employed at Carleton Woolen Mills for three or more years.

*See* Plaintiffs' Motion for Certification of Class Action at 1; Bankruptcy Court Procedural Order, January 31, 2001. Plaintiffs/Appellants currently before the Court include only the second class, consisting of Carleton union employees who were covered by a collective bargaining agreement ("CBA").[1] In this opinion, the class of Plaintiffs/Appellants will be referred to in two groups: (1) the third-shift union employees who were laid off in 1998 (hereinafter the "third-shift Plaintiffs"), and (2) the remaining union personnel who were laid off in 1999 or 2000 (hereinafter the "first- and second-shift Plaintiffs").

## I. Facts

In 1994, Allied purchased Carleton, which, thereafter, became a wholly-owned subsidiary of Allied. Carleton had two manufacturing facilities in Maine, one in Gardiner and a second in Winthrop. In 1995, Carleton entered into a CBA (the "1995 CBA") with the United Paperworkers International Union. The 1995 CBA contained a provision for severance pay to union workers of $150 for each year worked, if certain limited conditions involving "technological changes" were satisfied. The parties do not dispute that the terms of the 1995 CBA do not entitle these Plaintiffs/Appellants to any severance pay under the contract. The 1995 CBA continued in effect until September 1998.

As of August 1998, the Carleton Winthrop facility was operating with three shifts, employing more than 400 employees. On September 14, 1998, the third shift at Winthrop, consisting of over 100 union and nonunion employees, was laid off. No severance pay was provided to these employees.[2] After the layoff of the third shift, the first and second shifts and the physical facilities at Winthrop continued to operate, with Carleton continuing to employ approximately 300 persons.

Also on September 14, 1998, Carleton entered into a new CBA (the "1998 CBA") with the unionized workers at Winthrop. The 1998 CBA provided that, in the event of a "permanent plant closing," Carleton agreed to pay each union worker with

---

1. A class of plaintiffs made up of Carleton employees who lost their jobs in 1998, 1999, or 2000, and who were *not* covered by a collective bargaining agreement, have brought a parallel case against the Defendant for severance pay, *Kenneth Douglas v. Allied Textile Companies, PLC.*, Adv.Proc. No. 00–1049. That case has been stayed in the bankruptcy court pending the outcome of this appeal. The two cases share the same underlying operative facts, and Judge Haines denied partial summary judgment to Defendant on some of the factual disputes arising in both cases.

2. In July 1998, the Gardiner facility was closed by Carleton, and some personnel at Gardiner were paid severance.

more than one year of seniority severance payments in the amount of $275 for each year of "continuous service." The 1998 CBA had a three-year term and remained in effect through the date of Carleton's closure. Although the parties dispute the exact timing of individual layoffs at the Winthrop plant, they agree that the plant shut down sometime between December 29, 1999, and May 15, 2000.[3]

In the course of proceedings, the bankruptcy court granted Allied's Motion for Partial Summary Judgment, in part, and denied it in part.[4] The bankruptcy court held, *inter alia*, that the termination of the third-shift employees at Carleton's Winthrop plant in 1998 did not constitute a "termination of operations" of a "part" of a "covered establishment" triggering Maine's Severance Pay Statute and, thus, the third-shift Plaintiffs were not entitled to severance. *See* Bankruptcy Court's Order, October 16, 2001 ("October 16, 2001 Order"). It granted Defendant's Motion for Partial Summary Judgment on those issues.

Because material issues of fact remain disputed in the record, however, the bankruptcy court denied summary judgment on the question of whether employees laid off by Carleton in December 1999 and January 2000 were part of a "temporary shutdown" or lost their jobs due to a "termination of operations." *See* October 16, 2001 Order at 2; October 16, 2001 Transcript. The bankruptcy court decided that it would not apply the 1999 Amended Statute to the 1999/2000 Plaintiffs. *See id.* Hence, the court did not directly reach the question of whether the Statute infringed the Contracts Clauses of the United States and Maine Constitutions; instead, the bankruptcy court reasoned that the 1999 Amendment to 26 M.R.S.A. § 625–B(3)(B) was "probably unconstitutional" as applied to pre-existing contracts for payment of severance pay. In order to avoid holding the Statute unconstitutional, the bankruptcy court construed the 1999 Amendment to apply only to contracts negotiated subsequent to its 1999 effective date. Therefore, the court ruled, it was inapplicable to employees who were covered by contracts

---

**3.** The bankruptcy court denied summary judgment to Allied as to the date of the termination of the Winthrop facility, indicating that an issue of fact existed on that point. *See* Transcript of Telephonic Hearing In Re Decision of Summary Judgment, October 16, 2001 (hereinafter "October 16, 2001 Transcript") at 11–12. By early January, 2000, Carleton management shut down Winthrop's upper and lower mills, and 297 out of 326 employees were laid off. *See* Allied's Statement of Material Facts Not in Dispute; *see also* Plaintiffs' Response to Defendant's Statement of Material Facts Not in Dispute and Plaintiffs' Statement of Material Facts Not in Dispute. On February 13, 2000, Carleton called approximately 256 employees back to work. *Id.* On or about February 17, 2000, Carleton filed a voluntary petition under Chapter 11 of the U.S. Bankruptcy Code. *See* 11 U.S.C § 101 *et seq.* Despite having filed for bankruptcy, as of March 8, 2000, Defendant/Appellee maintains that Carleton management believed that

Carleton would be able to resume full operations on March 15, 2000. Defendant's Statement, at 5–6. On March 15, 2000, 116 employees were recalled for the lower mill only. *Id.* at 6. Allied maintains that active operations at Winthrop ceased between April 15, and April 21, 2000, and that the permanent shutdown of Carleton occurred on May 15, 2000. *Id.* In May 2000, termination letters were sent to 372 former employees. *Id.*

**4.** The bankruptcy court issued its ruling initially from the bench on October 16, 2001, followed by a written order on October 23, 2001. In response to Plaintiffs/Appellants' Motion to Amend, the bankruptcy court filed another order on January 9, 2002, granting Defendant/Appellee's Motion for Partial Judgment *in toto* as to the Plaintiffs/Appellants currently before the Court, *i.e.*, the Russell Plaintiffs.

that had been negotiated in 1998, before the amendment was enacted.[5]

## II. Basis for Appellate Jurisdiction

■ Section 158 of the Bankruptcy Code authorizes federal district courts to hear appeals from final orders of bankruptcy courts entered in cases referred to the bankruptcy courts under 28 U.S.C. § 157. *See* 28 U.S.C. § 158(a)(1). Appellants have filed a notice of appeal and have elected, pursuant to section 158(c), to have their appeal heard by the United States District Court for the District of Maine rather than the Bankruptcy Appellate Panel for the First Circuit. *See* 28 U.S.C. § 158(c)(1). The concept of "finality is [to be] given a flexible interpretation in bankruptcy, where necessary to accommodate concerns unique to the nature of bankruptcy proceedings." *In re Harrington,* 992 F.2d 3, 5 (1st Cir.1993) (internal quotations omitted); *see also Brandt v. Wand Partners,* 242 F.3d 6, 13–14 (1st Cir.2001). Although finality is elastic, a bankruptcy court order is not appealable as final "unless it conclusively determines 'a discrete dispute within the larger case' ... [, and] some special justification [must] be shown for departing from the finality rule relating to adversary proceedings and contested matters." *Fleet Data Processing Corp. v. Branch (In re Bank of New England Corp.),* 218 B.R. 643, 647 (1st Cir. BAP 1998) (quoting *In re Harrington,* 992 F.2d at 6 n. 3 and Fed.R.Civ.P. 54(b)) (internal quotations omitted). The bankruptcy court's order granting partial summary judgment in favor of Allied is a final order as to the Russell Plaintiffs/Appellants currently before this Court because the bankruptcy court dismissed their entire case in its January Order. This case also determines a discreet dispute regarding the applicability of the 1999 Amendment to

Plaintiffs/Appellants' claims under the Maine severance pay statute. *See* Transcript of Telephonic Pretrial Conference before the Honorable James B. Haines, Jr., January 8, 2002 (hereinafter "January Transcript") at 9.

## III. Standard of Review

■ The district court applies a "clearly erroneous" standard of review to a bankruptcy court's factual findings and *de novo* review to its conclusions of law. *See* Fed.R.Bankr.P. 8013; *Palmacci v. Umpierrez,* 121 F.3d 781, 785 (1st Cir.1997). "A court reviewing a decision of the bankruptcy court may not set aside findings of fact unless they are clearly erroneous, giving 'due regard ... to the opportunity of the bankruptcy court to judge the credibility of the witnesses.'" *Id.* (quoting Rule 8013). "The bankruptcy court's legal conclusions drawn from the facts so found, are reviewed de novo," by the district court, which applies the same standard of review as the court of appeals. *Id.* "The bankruptcy court's interpretation of particular statutes is a question of law," while application of a statute to the facts "poses a mixed question of law and fact, subject to the clearly erroneous standard, unless the bankruptcy court's analysis was infected by legal error." *In re Indian Motocycle Co., Inc.,* 261 B.R. 800, 805 (1st Cir. BAP 2001) (internal quotations omitted). The Court concludes that the threshold question of the effective date and applicability of the 1999 Amendment to the Severance Pay Statute in this case involves interpreting the statute and, therefore, it is a question of law subject to *de novo* review.

## IV. Discussion

### A. Third–Shift Employees

■ The parties do not dispute that the 1995 CBA covering the third-shift em-

---

**5.** The bankruptcy court further ruled that the Maine Severance Pay Statute was not pre-

empted by section 301 of the Labor Management Relations Act ("LMRA").

ployees contained a specific provision for severance pay, and that none of the employees terminated met the requirements entitling them to severance pay under that contract. Appellants argue, however, that because Allied has no liability under the contract for severance pay to the third-shift employees, Allied is liable for severance pay under the Severance Pay Statute. The bankruptcy court ruled that the closure of a single shift in the plant, although it contained more than 100 persons, was not the termination of "part of" a covered establishment within the meaning of the Severance Pay Statute. Therefore, the court held that the third-shift Plaintiffs were not entitled to severance pay under the Statute.

The Maine Severance Pay Statute in effect in 1998 when the third-shift employees were laid off provided, in relevant part:

> Any employer who relocates or terminates a covered establishment shall be liable to his employees for severance pay at the rate of one week's pay for each year of employment by the employee in that establishment. The severance pay to eligible employees shall be in addition to any final wage payment to the employee and shall be paid within one regular pay period after the employee's last full day of work, notwithstanding any other provisions of law.

26 M.R.S.A. § 625–B(2) (West.1998). Statutory terms are defined as follows:

> "Covered establishment" means any industrial or commercial facility or part thereof which employs or has employed at any time in the preceding 12–month period 100 or more persons.
>
> . . . .
>
> "Employer" means any person who directly or indirectly owns and operates a covered establishment. For purposes of this definition, a parent corporation is considered the indirect owner and oper-

ator of any covered establishment that is directly owned and operated by its corporate subsidiary.

> . . . .
>
> . . . .
>
> "Termination" means the substantial cessation of industrial or commercial operations in a covered establishment.

26 M.R.S.A. § 625–B(1)(A), (C) and (G) (West.1998). This version of the Statute provided that there was "no liability for severance pay to an eligible employee if: . . . The employee is covered by an express contract providing for severance pay; . . . or [t]hat employee has been employed by the employer for less than 3 years." 26 M.R.S.A. § 625–B(3)(B) and (D) (West 1998).

The determinative issue is whether, even if the Statute as it existed in 1998 were triggered, Allied would be exempt under the Statute on the rationale that third-shift Plaintiffs were covered by the 1995 CBA, which provided for severance pay in certain, albeit limited, circumstances inapplicable here. The Maine Law Court has held that the Maine Severance Pay Statute, as it read at the time of the 1998 layoffs, had "a very limited impact on the collective bargaining process inasmuch as it [did] not ever apply when the parties ha[d] reached an agreement on the subject of severance pay via an express contract." *Director of Bureau of Labor Standards, et al. v. Fort Halifax Packing Company,* 510 A.2d 1054, 1061 (Me.1986). In this case, the parties to the 1995 CBA had specifically bargained for, and reached an agreement, under which the third-shift employees were "covered by an express contract" that provided for severance, albeit to a very narrow group of Carleton union personnel. The Court concludes, therefore, that even if the Statute had been triggered, the third-shift Plaintiffs would not

have been entitled to severance pay under the Statute that was in effect in 1998, and the Court *AFFIRMS* the bankruptcy court's holding that the third-shift Plaintiffs are not entitled to recover severance pay *based on the Severance Pay Statute in effect in 1998.*

### B. The 1999 Amended Statute: Retroactivity

■ In April 1999, the Maine legislature amended the Severance Pay Statute, effective October 1, 1999, to provide that the employer exemption was available only if the amount of severance to be paid under an express contract met a statutory minimum requirement. After the 1999 Amendment, the mitigation provision read: "There is no liability *under this section* for severance pay to an eligible employee if: . . . The employee is covered by an express contract providing for severance pay *that is equal to or greater than the severance pay required by this section . . . .*" 26 M.R.S.A. § 625–B(3)(B) (West.2002, revised language emphasized).

The issue here is whether the Severance Pay Statute, as amended in 1999, should apply to "all persons who were employed at the Carleton Woolen Mills in Winthrop, Maine, during 1998 or 1999, under a collective bargaining agreement, and who were separated from employment at Carleton as a result of the closure of the Mill (or any part of it) and who had been employed at Carleton Woolen Mills for three or more years" because the termination of the plant occurred after the effective date of the Amended Statute. Ap-

pellee maintains that the bankruptcy court correctly interpreted the 1999 Amendment as prospective in order to avoid its possible unconstitutionality, suggesting that the Amendment probably should not supercede preexisting contracts for severance pay. Appellee Brief at 4, 5. It argues that a statute is retroactively applied "when applied so as to determine the legal significance of acts or events that occurred prior to its effective date," *Terry v. St. Regis Paper Co.,* 459 A.2d 1106, 1108 (Me.1983) (quoting *Coates v. Maine Employment Sec. Comm'n,* 406 A.2d 94, 96 (Me.1979)), and insists that here Appellants are seeking retroactive application because the 1998 CBA was signed before the effective date of the Amended Statute. Hence, the issue reduces to which event, the 1999–2000 layoff or the 1998 CBA, is the reference point for determining if a retroactive application of the Statute will occur.

■ Given no express statement by the Maine legislature that the Amendment applies retroactively, Maine law dictates no retroactive application.[6] However, interpreting the Amendment to apply to an "operative event" occurring after the effective date of the statute is not the same as giving it retroactive effect. *See Liberty Mutual Ins. Co. v. Superintendent of Insurance,* 689 A.2d 600, 602 (Me.1997) ("the application of a statute remains prospective if it governs operative events that occurred after its effective date, even though the entire state of affairs includes events predating the statute's enactment") (citations omitted); *see also Barnes v.*

---

6. In order to make a statute retroactive, the Maine Law Court has stated that the rule of statutory construction "requires the Legislature to express its intent to apply a statute retroactively in strong, clear and imperative language, [and] we will only imply a retroactive intent when the statute would be inoperative other than retrospectively." *Terry,* 459 A.2d at 1109 (citations omitted). Where the legislature expressed no consensus regarding the possible retroactivity of a worker's compensation amendment, the *Terry* Court held that it was unable to find the requisite "clear expression of legislative intent favoring retroactivity." *Id.* The 1999 Amendment was enacted and signed into law on April 6, 1999, and it became effective in October 1999.

*Commissioner of the Department of Human Services,* 567 A.2d 1339, 1341 (Me. 1989) (quoting *Norton v. C.P. Blouin, Inc.,* 511 A.2d 1056 (Me.1986)). Determination of the "operative event" is conclusive on this question of the temporal effect of the application of the 1999 Amendment to the claims of the first- and second-shift Plaintiffs.

### 1. First- and Second–Shift Plaintiffs Laid Off in 1999/2000

The bankruptcy court ruled that it would not apply the 1999 Amendment to the first- and second-shift employees who were terminated in 1999/2000 because their 1998 CBA was negotiated before the 1999 effective date of the Amended Statute in order to bypass the issue of the constitutionality of the Statute on the premise that it might be retroactively applied. That premise is incorrect. There is no retroactive application problem here on the facts of the case. Regardless of the dispute over whether the termination of operations at the Carleton facility occurred in December 1999 or May 2000, it clearly occurred after the October 1999 effective date of the Amendment to the statute, and it encompassed the mass layoffs of the entire plant remaining at the Carleton facility. The Court finds that the 1999/2000 layoffs of the first and second shifts were clearly connected to the termination of the plant, and the Court concludes that *the plant closure* was the "operative event" vis-à-vis the first- and second-shift Plain-

tiffs. Thus, the Amended version of the Statute, in effect at the time of the layoffs, should apply to the first- and second-shift employees' terminations and its application to these Plaintiffs is not "retroactive" in effect. The bankruptcy court's refusal to apply the 1999 statute to the subject claims is *REVERSED.*

### C. Unconstitutionality: Contracts Clause

■ This Court's conclusion that the 1999 Act *does* apply to the severance pay claims of the first- and second-shift Plaintiffs negates entirely the bankruptcy court's attempt to artfully bypass the constitutional question of whether its application to the 1998 CBAs will unconstitutionally impair the obligation of those contracts. *See generally, General Motors Corp., et al. v. Romein,* 503 U.S. 181, 112 S.Ct. 1105, 117 L.Ed.2d 328 (1992) (holding that application of amended state statute regarding workers compensation benefit coordination, which was enacted subsequent to collective bargaining agreement, did not violate contracts clause); *see also Energy Reserves Group, Inc. v. Kansas Power and Light Co.,* 459 U.S. 400, 410, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983). The record in reflecting the decision below, carefully parsed, leads the Court to conclude that the bankruptcy court has not decided that issue by a principled and determined course of rational analysis and did not intend to do so.[7] There is a dis-

---

7. In the oral opinion, Judge Haines's articulation of his rationale on this point reads, in pertinent part, as follows:

There's no evidence—aside from the fact that the statute might be read that way—but there's no evidence in the legislative history that the legislature intended to nullify previously negotiated safe harbor severance pay contract clauses. To apply the statute to override the agreement that the parties—that was in place here would do just that.

Thus, ... consistent with Maine law, I am going to interpret the statute to construe it to have prospective operation only and to regulate further negotiation of severance pay agreements rather than to what would likely be [sic] impermissibly alter preexisting contract rights that had been negotiated with the expectation that they were within the safe harbor provided by the pre-[1999] amendment version of Section [625–B].... For that reason, and so interpreting the

crete, structural pattern of legal analysis applicable in this circuit to the resolution of such a question.[8] This Court is satisfied that the bankruptcy court's articulation of its concern about the possibility that the application of the 1999 statute, in the circumstances of this case, would be constitutionally impermissible is not intended to indicate that the judge had mentally engaged with the postulates of the appropriate, structural, analytical path to reach a principled *decision* that application of the 1999 statute would unconstitutionally impair the obligations of the 1998 CBA. Hence, that issue is not ripe for review in this proceeding on an appellate review basis. This Court has jurisdiction only to review in an appellate capacity decisions made by the bankruptcy court and duly appealed to this Court under 28 U.S.C. § 158(a).

Accordingly, the case must be remanded to the bankruptcy court for a decision of first instance on this issue.

---

contract, I just would also note that under the circumstances, I don't think this is— even though it's a constitutional point relating to an as yet unconstrued State statute, given the fact that there is no pending litigation in the State courts and given the fact that there is a way to read and apply the statute fairly consistent with the legislative objective to avoid the constitutional problem, this is not a case for abstention. So on that basis, I am granting summary judgment to Allied, not on the basis that there is an unconstitutional impairment of contracts affected by the '99 amendments to Section 625–B—although were that put to me squarely, I likely would conclude that there is—but because the statute should and will be applied in this instance consistent with the legislative objective to apply prospectively to express employment contracts entered into after its effective date only. October 16, 2001 Transcript at 23–25; Supp. Record at 57.

8. The analysis under the Contracts Clause, as structured by the Court of Appeals for the

## D. Section 301 of the LMRA Preemption

The bankruptcy court ruled that Section 301 of the Labor Management Relations Act, 29 U.S.C.A. § 185, does not preempt operation of the Maine State Severance Pay Statute. Appellee contends that the bankruptcy court erred and that Section 301 does preempt the state law because it requires the Court to interpret a CBA. This Court reviews the bankruptcy court's conclusion *de novo.* The Supreme Court has held that Section 301 completely preempts suits attempting to enforce collective bargaining agreements via state law. *See Avco Corp. v. Machinists,* 376 F.2d 337, 340 (6th Cir.1967), *aff'd,* 390 U.S. 557, 558, 88 S.Ct. 1235, 1236, 20 L.Ed.2d 126 (1968) (holding that when "[t]he heart of the [state-law] complaint [is] a . . . clause in the collective bargaining agreement," that complaint "arises under federal law"). The Supreme Court stated:

[T]he preemptive force of § 301 is so powerful as to displace entirely any

---

First Circuit, requires a court to "first ascertain whether a change in state law has resulted in 'the substantial impairment of a contractual relationship,'" and then to "determine whether the impairment is nevertheless justified as 'reasonable and necessary to serve an important public purpose.'" *Parker v. Wakelin,* 123 F.3d 1, 4–5 (1st Cir.1997) (citing *General Motors v. Romein,* 503 U.S. 181, 186, 112 S.Ct. 1105, 117 L.Ed.2d 328 (1992)) (quoting *Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 244, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978) and *United States Trust Co. of New York v. New Jersey,* 431 U.S. 1, 25, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977)). "The first step . . . can be further broken down into 'three components: whether there is a contractual relationship, whether a change in law impairs that contractual relationship, and whether the impairment is substantial.'" *Parker,* 123 F.3d at 5; *see also Houlton Citizens' Coalition v. Town of Houlton,* 175 F.3d 178, 190 (1st Cir.1999).

state cause of action "for violation of contracts between an employer and a labor organization." Any such suit is purely a creature of federal law, notwithstanding the fact that state law would provide a cause of action in the absence of § 301.

*Caterpillar Inc. v. Williams*, 482 U.S. 386, 393–394, 107 S.Ct. 2425, 2430, 96 L.Ed.2d 318 (1987) (quoting *Franchise Tax Bd. of State of Cal. v. Construction Laborers Vacation Trust for Southern Cal.*, 463 U.S. 1, 23, 103 S.Ct. 2841, 2853–2854, 77 L.Ed.2d 420). The Court of Appeals for the First Circuit recently held that Section 301 preempted claims by former employees of entitlement to severance pay pursuant to a Puerto Rican law. *See Vargas v. Geologistics Americas, Inc.*, 284 F.3d 232 (1st Cir. 2002). In that case, however, the law required some compensation in the event of an employment termination "without just cause." *Id.* at 235. Such a determination, the court ruled, "presupposes an analysis of the rights and duties imposed by the CBA." *Id.*

This case is distinguishable because the source of rights is, by definition, not the collective bargaining agreement, because the Maine Severance Pay Statute provides a minimum level of benefits to employees notwithstanding or absent collective bargaining agreements. *See* 26 M.R.S.A. § 625–B; *see also Fort Halifax Packing Company, Inc. v. Coyne*, 482 U.S. 1, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987) (holding that the pre–1999 version of the Maine Severance Pay Act simply imposed a one time severance payment to employees in the event of plant closing, operating only in the absence of a contract, and that it was not preempted by either ERISA or the NLRA); *see also Opinion of Justices of Supreme Judicial Court*, 571 A.2d 805, 809 (Me.1989) (differentiating the Maine State Severance Pay Statute as "state action establishing generally applicable minimum substantive labor standards" as opposed to state laws going "to the core of the collective bargaining process," such as striker replacement legislation, which the Maine Law Court held would be preempted under the NLRA). The Amended Statute only operates when parties have failed to comply by contract with the statutory minimum requirement, and alleged violations of any contractual obligations are simply ancillary to application of the Statute.[9] The Court concludes that the bankruptcy court correctly ruled that Section 301 does not preempt the Maine Severance Pay Statute.

### V. Order

It is **ORDERED** that Appellants' Appeal of the Bankruptcy Court's Order granting Allied Partial Summary Judgment be, and it is hereby, **AFFIRMED** in part, and **VACATED** in part. Specifically, the Bankruptcy Court's Order is **VACATED** as to the refusal to apply the 1999 Statute to those claims of the first- and second-shift Plaintiffs/Appellants within the scope of the 1998 CBA. It is further **ORDERED** that the case be, and it is hereby, **REMANDED** to the bankruptcy court for resolution of the impairment of contracts question now generated and any remaining issues of material fact in the application of the Amended Severance Pay Statute.[10]

---

**9.** For example, any severance pay due under a contract should be calculated to offset the statutory obligation. *See* October 16, 2001 Transcript at 14–15.

**10.** The Court points out the following consid-

eration relative to the claims of the third-shift Plaintiffs that the bankruptcy court should ponder on remand. The bankruptcy court found that material issues of fact remained in dispute regarding the alleged link between the 1998 third-shift layoffs and the ultimate termination and shutdown of the plant in 1999/2000. *See* October 16, 2001 Transcript, at 11–12. It appears to the Court that the claims of the third-shift Plaintiffs for severance pay under the 1999 Statute *may* resurface in light of this Court's ruling today on the following potential rationale. If the genuine issues of material fact concerning the relation of the 1998 layoffs and the 1999/2000 shutdown of the plant are resolved in favor of the third-shift employees, then the adequacy of *their* claims, like those of the first- and second-shift employees, would be governed by the application of the 1999 Act (as opposed to the 1998 Act, the application of which was the basis for the bankruptcy court's granting of summary judgment to the Plaintiffs on these claims). Were that to become the situation, the third-shift Plaintiffs would be entitled to the benefit of the resolution of the "impairment of contracts" issue that is now generated by application of the 1999 Act with reference to the *1995* CBA, and depending on the resolution of that issue, they might recover on their claims.

This Court leaves it to the bankruptcy court and counsel to determine on remand if the effect of this Court's action on appeal restructures the case below with reference to the claims of the third-shift employees so that resolution of the subject genuine issues of fact is *now* required.