**PAPER, ALLIED–INDUSTRIAL, CHEMICAL AND ENERGY WORKERS INTERNATIONAL UNION, AFL–CIO, CLC, Plaintiff**

v.

**ALLIED TEXTILE COMPANIES, PLC, a.k.a. Allied Textiles Limited, Defendant**

**No. Civ. 02–133–P–C.**

United States District Court, D. Maine.

Dec. 30, 2002.

---

Jonathan S.R. Beal, Fontaine & Beal, P.A., Portland, ME, for Plaintiff.

U. Charles Remmel, II, Kelly, Remmel & Zimmerman, Portland, ME, Lawrence Coe Lanpher, Judith Sturtz Karp, Adam C. Paul, Kirkpatrick & Lockhart LLP, Washington, DC, for Defendant.

## ORDER AFFIRMING THE RECOMMENDED DECISION OF THE MAGISTRATE JUDGE

GENE CARTER, District Judge.

The United States Magistrate Judge filed with the court on November 18, 2002, with copies to counsel, his Recommended Decision on Defendant's Motion to Dismiss (Docket Item No. 11); and Plaintiff filed its objection thereto on November 29, 2002 (Docket Item No. 12), to which objection Defendant filed its response on December 11, 2002 (Docket Item No. 14). Defendant filed its objection to the Magistrate's Recommended Decision on December 2, 2002 (Docket Item No. 13). This court having reviewed and considered the Magistrate Judge's Recommended Decision, together with the entire record and, having made a *de novo* determination of all matters adjudicated by the Magistrate Judge's Recommended Decision, and concurring with the recommendations of the United States Magistrate Judge for the reasons set forth in his Recommended Decision, it is **ORDERED** as follows:

(1) Plaintiff's objection is hereby **DENIED**;

(2) Defendant's objection is hereby **DENIED**;

(3) The Recommended Decision of the Magistrate Judge is hereby **AFFIRMED**;

(4) Allied's motion to dismiss is hereby **GRANTED** on the basis of failure to state a claim.[1]

---

1. The Court notes that the Magistrate Judge also acted to deny the Plaintiff's Motion to Take Judicial Notice (Docket Item No. 8), a nondispositive action subject to review by this

*RECOMMENDED DECISION ON DE-FENDANT'S MOTION TO DISMISS AND MEMORANDUM DECISION ON PLAINTIFF'S MOTION TO TAKE JUDICIAL NOTICE*

COHEN, United States Magistrate Judge.

Defendant Allied Textile Companies Limited, successor-in-interest to Allied Textile Companies, PLC (either, "Allied"), moves to dismiss the instant action in its entirety pursuant to Federal Rules of Civil Procedure 12(b)(6) (failure to state a claim) and 12(b)(2) (lack of personal jurisdiction). Motion To Dismiss for Failure To State a Claim and for Lack of Personal Jurisdiction ("Motion To Dismiss") (Docket No. 2). In connection therewith, plaintiff Paper, Allied–Industrial, Chemical and Energy Workers International Union, AFL–CIO, CLC ("PACE") moves the court to take judicial notice of a recent ruling of the bankruptcy court. Motion To Take Judicial Notice ("Motion To Take Notice") (Docket No. 8). For the reasons that follow, I deny the Motion To Take Notice and recommend that the Motion To Dismiss be denied as to personal jurisdiction but granted as to failure to state a claim.

## I. Personal Jurisdiction

### A. Applicable Legal Standards

A motion to dismiss for lack of personal jurisdiction raises the question whether a defendant has "purposefully established minimum contacts in the forum State." *Hancock v. Delta Air Lines, Inc.*, 793 F.Supp. 366, 367 (D.Me.1992) (citation and internal quotation marks omitted). The plaintiff bears the burden of establishing

jurisdiction; however, where (as here) the court rules on a Rule 12(b)(2) motion without holding an evidentiary hearing, a *prima facie* showing suffices. *Archibald v. Archibald*, 826 F.Supp. 26, 28 (D.Me.1993). Such a showing requires more than mere reference to unsupported allegations in the plaintiff's pleadings. *Boit v. Gar–Tec Prods., Inc.*, 967 F.2d 671, 675 (1st Cir. 1992). However, for purposes of considering a Rule 12(b)(2) motion the court will accept properly supported proffers of evidence as true. *Id.*

### B. Factual Context

For purposes of the Rule 12(b)(2) portion of Allied's motion I accept the following, with conflicts resolved in favor of PACE's properly supported proffers of evidence, as true.

Since 1985 Derek Harold Wood, a citizen of the United Kingdom, has been employed by Allied, which is organized under the laws of England and Wales. Affidavit of Derek H. Wood ("First Wood Aff."), *Douglas v. Allied Textile Cos. (In re Carleton Woolen Mills, Inc.) ("Douglas")*, No. 00–10214 (Bankr.D.Me.), attached as Exh. B to Memorandum of Points and Authorities in Support of Defendant's Motion To Dismiss for Failure To State a Claim and for Lack of Personal Jurisdiction ("Dismiss Memorandum") (Docket No. 3), ¶¶ 1–2. In October 1987 Wood was appointed a director of Allied and since then has had primary responsibility for overseeing its investments in businesses involved in its Natural Fibers Division, including Carleton Woolen Mills, Inc. ("Carleton"). *Id.* ¶ 2.

Court on appeal pursuant to 28 U.S.C. § 636(b)(1)(A). Neither party has filed any notice of appeal from that action (or otherwise initiated any challenge thereto in the written objections to the Recommended Decision). Because of the absence of such a no-

tice of appeal, the court has not undertaken any review of the denial of the Motion to Take Judicial Notice. *Jacobsen v. Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C.*, 594 F.Supp. 583, 585 (D.Me.1984).

Allied, which has its principal offices in West Yorkshire, England, is a holding company, owning the stock of approximately seventeen businesses and five legal trading entities, all in the textile business. *Id.* ¶ 3. All of its employees work out of offices in the United Kingdom. *Id.* In February 1994, in a transaction that took place in New York City, Allied purchased 100 percent of the issued and outstanding stock of Carleton, a corporation organized under the laws of Delaware. *Id.* ¶ 4. Wood, who was the director responsible for overseeing Allied's investment in Carleton, served on the Carleton board of directors along with another Allied officer, John Corrin. *Id.* ¶ 5. Carleton's United States management chose the other two Board members. *Id.* Both Corrin and Wood served without compensation as directors of the Carleton board until their resignations in January 2000. *Id.* The Carleton board did not meet regularly during the period between 1994 and January 2000. *Id.*

When Allied purchased the Carleton stock in 1994, Carleton had offices in New York and Maine. *Id.* ¶ 6. Carleton's New York office was in New York City, where its chief executive officer and chief marketing officer worked. *Id.* Carleton's Maine offices were in Gardiner and Winthrop, where it had woolen cloth manufacturing facilities. *Id.*

Wood spent a substantial amount of his working time in West Yorkshire, England, but also traveled on approximately a monthly basis to various locations around the United Kingdom and elsewhere to monitor Allied's natural-fibers investments. *Id.* ¶ 7. He visited the United States approximately nine to ten times per year for purposes of monitoring Allied's investment in Carleton. *Id.* Typical visits involved a flight to New York on a Monday to meet for a half-day with the Carleton

chief executive officer—most recently Lawrence Heller—followed by a flight to Maine. *Id.* Wood's visits to Maine generally would last one-and-a-half days and include meetings with the various department heads of Carleton, initially at both the Winthrop and Gardiner sites and then, after closure of the Gardiner site in 1998, only at the Winthrop site. *Id.*

After Heller was appointed as Carleton's chief operating officer, Corrin wrote him by letter dated February 24, 1995:

> May I formally congratulate you on your recent appointment as Chief Operating Officer at Carleton Woolen Mills. . . .
>
> It is perhaps appropriate to remind you of one or two standing rules of operation which very occasionally are unfortunately broken.
>
> All capital expenditure over $5,000 must be approved by the Allied Textiles Board before authorization. Capital expenditure below $5,000 can be agreed on the spot or by telephone with Derek Wood or, failing Derek's availability, with me. In either case Derek or I must report that authority has been granted in advance at the next Board Meeting of Allied Textiles.
>
> No contracts or commitments must be entered into of any nature whatsoever where the liability, benefit, consequence, or impact on the company extends beyond one year without the prior authority of the Allied Textiles Board. This is all embracing and covers leasing arrangements, rental arrangements, forward contracts, payments in advance, insurance or any transaction.
>
> We have had to become very strict on these matters as the Directors now have to certify that the systems of internal control which are in operation are "effective."

Letter dated February 24, 1995 from J.R. Corrin to L.E. Heller, Esq. ("Heller

Letter"), attached as Exh. 4/DW.40.66–67 to Plaintiff's Memorandum of Law in Opposition to Defendant's Motion To Dismiss for Failure To State a Claim and for Lack of Personal Jurisdiction ("Dismiss Opposition") (Docket No. 6), at 1.

In 1998 Carleton entered into a new collective bargaining agreement ("CBA") with PACE. Affidavit of Derek H. Wood ("Second Wood Aff."), attached as Exh. D to Dismiss Memorandum, ¶ 5. On September 9, 1998 Wood received a call from a Carleton employee notifying him that an agreement had been reached with PACE and informing him of its terms. *Id.* He agreed that the proposed terms were favorable with respect to Carleton, and made notes of the conversation stating in relevant part:

> With regard to the Union negotiations, at 9:00 p.m. last evening I agreed that the Union meeting could break up with 0% for next year and 2½% and 3% for years 2 + 3. I am told that this 'deal' is unprecedented.... The Union left agreeing to put it to their membership and the recommended strike threat was abated. NB. The plants have been closed for 2 weeks from 28th Aug and only 2 shifts will resume on 14th Sept[.] In the light of the recent info I will be looking at a single shift during meetings week commencing 21st September[.]

*Id.* & handwritten notes dated Oct. 9, 1998, attached thereto, at 2. This was Allied's only involvement with respect to the CBA, to which Allied was not a party. Second Wood Aff. ¶ 5.

The 1998 CBA was negotiated on September 8 and 9, 1998 in Winthrop, Maine. Affidavit of Raymond Hinckley, *Douglas,* attached as Exh. 4/PA to Dismiss Opposition, ¶¶ 1–2. Raymond Hinckley, who served as an international representative for PACE during these negotiations, recalled that on the afternoon of September

9 PACE and Carleton had reached a tentative agreement wherein the workers would receive 0 percent, 2.5 percent and 3 percent during the three-year proposed contract when the team for Carleton asked to caucus. *Id.* ¶ 3. Thomas Smith, attorney on the company bargaining team, said the team had to get approval for this final proposal. *Id.* They left and went to another office. *Id.* When they returned a short while later they said the company would accept those terms. *Id.* ¶ 4.

## C. Analysis

■ As a threshold matter, I consider PACE's motion to take judicial notice. On October 23, 2002, two days after Allied filed its reply brief in the instant matter, bankruptcy court Chief Judge Haines filed an order denying a motion to dismiss in an adversary proceeding initiated by PACE in Carleton's chapter 7 bankruptcy case. *See* Order Denying Defendants' Motion To Dismiss ("Haines Decision"), *PACE v. Corrin (In re Carleton Woolen Mills, Inc.) ("Corrin"),* No. 00–10214 (Bankr.D.Me. Oct. 23, 2002), attached to Motion To Take Notice. Allied argues, among other things, that the ruling is irrelevant. *See* Defendant's Response to Plaintiff's Motion To Take Judicial Notice ("Notice Opposition") (Docket No. 9) at 2–3. I agree.

■ PACE contends that the court possesses both "general" and "specific" jurisdiction over Allied in this case. *See* Dismiss Opposition at 14–26. General jurisdiction arises when the defendant has engaged in substantial or systematic and continuous activity, unrelated to the subject matter of the action, in the forum. *See, e.g., Scott v. Jones,* 984 F.Supp. 37, 43 (D.Me.1997). Specific jurisdiction is based on a relationship between the forum and the particular acts or injuries that provide the basis for the action, that is, "where the cause of action arises directly out of, or relates to, the defendant's forum-based

contacts." *United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp. ("Pleasant St. I")*, 960 F.2d 1080, 1088–89 (1st Cir.1992). The parties agree that, inasmuch as the instant case is premised on the existence of a federal question, the relevant "forum" is the United States as a whole, not the state of Maine. *See, e.g.,* Dismiss Memorandum at 12; Dismiss Opposition at 15; *see also, e.g., United States v. Swiss Am. Bank, Ltd.*, 274 F.3d 610, 618 (1st Cir.2001) (noting that in federal-question case in which service of process is grounded on Fed.R.Civ.P. 4(k)(2), rather than state long-arm statute, question is whether "the parties have sufficient contacts with the United States as a whole").

■ Inasmuch as appears, Judge Haines found it unnecessary in *Corrin* to reach the issue of general jurisdiction, ruling that PACE had established the propriety of the exercise of specific jurisdiction over Allied, Corrin and Wood. *See* Haines Decision; Notice Opposition at 3; Plaintiff's Reply to Defendant's Response to Motion To Take Judicial Notice (Docket No. 10) at 4. Determination of the existence of specific jurisdiction entails a tripartite analysis:

> First, an inquiring court must ask whether the claim that undergirds the litigation directly relates to or arises out of the defendant's contacts with the forum. Second, the court must ask whether those contacts constitute purposeful availment of the benefits and protections afforded by the forum's laws. Third, if the proponent's case clears the first two hurdles, the court then must analyze the overall reasonableness of an

exercise of jurisdiction in light of a variety of pertinent factors that touch upon the fundamental fairness of an exercise of jurisdiction.

*Swiss Am. Bank*, 274 F.3d at 620–21 (citation and internal quotation marks omitted). However, in this case, Allied puts PACE to its proof as to only one of these three prongs: relatedness. *See* Dismiss Memorandum at 16–18. As to this prong, the Haines Decision is unilluminating.

Relatedness turns on "the nexus between defendant's contacts and the plaintiff's cause of action." *Swiss Am. Bank*, 274 F.3d at 621 (citations and internal quotation marks omitted). The subject matter of *Corrin* is the alleged liability of Allied, Wood and Corrin under the federal Worker Adjustment and Retraining Notification Act ("WARN Act"), 29 U.S.C. §§ 2101–09, on theories that (i) Allied functioned as a "single employer" with Carleton within the meaning of relevant WARN Act regulations and (ii) Corrin and Wood exposed themselves to WARN Act liability by virtue of alleged fraud, deceit and breaches of fiduciary duty. *See generally* Complaint, *Corrin*, attached to Notice Opposition. The instant suit, on the other hand, seeks to hold Allied liable on breach-of-contract and judicial-estoppel theories for violation of the CBA to which PACE and Carleton were signatories. Complaint and Motion To Compel Arbitration ("Complaint") (Docket No. 1) at 1.[1] The subject matter of *Corrin* is too distinct from that of the instant case for the relatedness component to have any bearing on the analysis necessary here. The Motion To Take No-

---

1. PACE's breach-of-contract counts in the instant complaint hinge on its contention that Allied and Carleton constituted a "single employer" for purposes of 29 U.S.C. § 185 and common law. Complaint at 1. In the Warn Act context, factors relevant to whether a parent and subsidiary constitute a "single em-

ployer" include: "(i) common ownership, (ii) common directors and/or officers, (iii) de facto exercise of control, (iv) unity of personnel policies emanating from a common source, and (v) the dependency of operations." 20 C.F.R. § 639.3(a)(2). As discussed below, the test for purposes of 29 U.S.C. § 185 differs.

tice accordingly is denied. *See, e.g., Woodham v. Ratelle*, 5 Fed.Appx. 635, 637 n. 3 (9th Cir.2001) (denying motion to take judicial notice on ground of irrelevancy).

 I turn to the question whether Allied's contacts with the United States are sufficiently related to the subject matter of the PACE complaint (*i.e.*, the CBA) to pass the relatedness test in this case. I conclude that they are. As the First Circuit has noted, "We have approached the relatedness inquiry with slightly different emphases when the plaintiff asserts a contract claim then [sic] when she asserts a tort claim: if a contract claim, our stereotypical inquiry tends to ask whether the defendant's forum-based activities are instrumental in the formation of the contract[.]" *Massachusetts Sch. of Law at Andover, Inc. v. American Bar Ass'n*, 142 F.3d 26, 35 (1st Cir.1998) (citation and internal quotation marks omitted).

The evidence presented, viewed in the light most favorable to PACE, establishes that Allied exercised considerable control over Carleton's operations, requiring, among other things, that "[n]o contracts or commitments must be entered into of any nature whatsoever where the liability, benefit, consequence, or impact on the company extends beyond one year without the prior authority of the Allied Textiles Board." *See* Heller Letter. The CBA in issue was negotiated in the United States (specifically, in Maine) between representatives of PACE and Carleton on September 8–9, 1998. Carleton representatives were not authorized to conclude negotiations without Allied's express approval of key terms. They sought and received such approval via a telephone call placed to Wood in the United Kingdom on September 9, 1998, whereupon they returned to the bargaining table and negotiations concluded.

In a similar situation, in which a union sought to hold a Scottish parent company liable for breach of a CBA to which the parent was not a signatory, the First Circuit found the relatedness test "[o]bviously" satisfied on evidence that the parent had retained an agent to negotiate the CBA, negotiations took place in the forum state and the agent often called "individuals in Scotland" from the forum state before agreeing to any proposals. *United Elec. Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp. ("Pleasant St. II")*, 987 F.2d 39, 45–46 n. 14 (1st Cir.1993). In Allied's view, *Pleasant St. II* is distinguishable in that Allied never hired an agent or actively participated in negotiations— merely agreeing to the bargained terms after the fact—as a result of which the single contact between Carleton representatives and Wood on September 9, 1998 cannot constitute the requisite "forum-based activities … instrumental in the formation of the contract." Defendant's Reply to Plaintiff's Opposition to Motion To Dismiss for Failure To State a Claim and for Lack of Personal Jurisdiction ("Dismiss Reply") (Docket No. 7) at 6. In so arguing, Allied understates the critical nature of the role it played. In the final analysis, Allied was as instrumental to the PACE–Carleton CBA negotiations as was the parent corporation in *Pleasant St. II*: Without its express approval, there would have been no new CBA. While Allied had only one contact (via Wood) with the Carleton negotiating team in Maine, it was the critical contact.[2]

---

**2.** Allied further asserts that "the only activity by Allied related to the CBA (Allied's 'acceptance' of the terms of the CBA) did not occur in Maine." Dismiss Reply at 6. This argument misses the mark. *See, e.g., Electrosource, Inc. v. Horizon Battery Techs., Ltd.*, 176 F.3d 867, 874 (5th Cir.1999) ("The Supreme Court long ago rejected the notion that

For the foregoing reasons, I recommend that the court find the exercise of specific jurisdiction over Allied appropriate in this case.

## II. Failure To State a Claim

### A. Applicable Legal Standards

"When evaluating a motion to dismiss under Rule 12(b)(6), [the court] take[s] the well-pleaded facts as they appear in the complaint, extending [the] plaintiff every reasonable inference in his favor." *Pihl v. Massachusetts Dep't of Educ.*, 9 F.3d 184, 187 (1st Cir.1993). The defendant is entitled to dismissal for failure to state a claim only if "it appears to a certainty that the plaintiff would be unable to recover under any set of facts." *Roma Constr. Co. v. aRusso*, 96 F.3d 566, 569 (1st Cir.1996); *see also Jackson v. Faber*, 834 F.Supp. 471, 473 (D.Me.1993).

Ordinarily, in weighing a Rule 12(b)(6) motion, "a court may not consider any documents that are outside of the complaint, or not expressly incorporated therein, unless the motion is converted into one for summary judgment." *Alternative Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 33 (1st Cir.2001). "There is, however, a narrow exception for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint." *Id.* (citation and internal quotation marks omitted).

### B. Factual Context

For purposes of the Rule 12(b)(6) portion of Allied's motion I accept the following as true.

The instant suit is brought pursuant to 29 U.S.C. § 185 and the common law.

Complaint at 1. Allied at all relevant times was an alien textile conglomerate, a corporation organized under the laws of England and Wales with its principal place of business in Birstall, West Yorkshire. *Id.* ¶ 1. It owned and operated various business and trading entities in the United Kingdom, Germany, Canada and the United States, including Carleton. *Id.* Carleton is a corporation organized under the laws of the state of Delaware with a former principal place of business in Winthrop, Maine. *Id.* ¶ 2. At the time it ceased operating, it had two mills and administrative offices in Winthrop and a sales and marketing office in New York City. *Id.* On February 17, 2000 Carleton filed for protection under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court, District of Maine, Case No. 00–10214. *Id.* ¶ 3. That case has been converted to a chapter 7 proceeding. *Id.*

PACE is a labor organization with a place of business in Gorham, Maine that has at all material times represented the production and maintenance employees at Carleton's Winthrop locations (the "Affected Employees"). *Id.* ¶¶ 4–5.

Allied purchased all of the stock of Carleton in 1994. *Id.* ¶ 10. At that time Carleton was one of the premier woolen mills in North America, known for its production of high-quality yarn and as one of the world's largest producers of billiard and gaming-table fabrics. *Id.* Wood and Corrin were at all material times until early 2000 officers, managers and directors of Allied and managers and directors of Carleton. *Id.* ¶ 12. Allied, through Wood, Corrin and other agents, at all material times until early 2000 managed and directed the operations of Carleton, including but not limited to its labor relations, em-

---

personal jurisdiction might turn on mechanical tests or on conceptualistic ... theories of the place of contracting or of performance.")

(citation and internal quotation marks omitted).

ployment policies and practices and most other aspects of its day-to-day operations. *Id.* ¶ 13. The CBA between Carleton and PACE was executed on or about October 12, 1998 and had a term of three years with automatic renewals thereafter. *Id.* ¶ 14. Signatory parties were Carleton and PACE. *Id.*

Carleton has at all material times been a wholly owned subsidiary and/or division of Allied. *Id.* ¶ 15. Allied's officers and directors acted as officers and directors of Carleton. *Id.* ¶ 16. In October 1998, Allied through Wood specifically authorized and agreed to the terms and conditions of the CBA, in consultation with the bargaining team at Carleton. *Id.* ¶ 17. Wood assumed responsibility for Allied of "liaison" with Carleton, in which role he visited Carleton on at least a monthly basis, had frequent telephone conferences with local management, either directed or approved Carleton's financial plans and strategies and assumed detailed, hands-on control of all of its management decisions in accordance with an Allied policy to maintain "internal controls" of its affiliates in a "very strict" manner. *Id.* ¶ 18. The Allied system of internal control rendered the functions of the Carleton board of directors virtually meaningless. *Id.* ¶ 19. The board never met together as a body or even functioned at all except to consider formal resolutions required for some technical reason. *Id.*

On November 30, 1999 Allied decided to cut off completely its support of Carleton with the knowledge that this decision would force Carleton into filing for bankruptcy protection and would result in closure of both the upper and lower Winthrop mills. *Id.* ¶ 20. On December 10, 1999, in a scripted telephone call, Wood revealed to Carleton's local management that Allied was no longer prepared to provide financial support and was "hand[ing]" over the "baton with regard to running the company." *Id.* ¶ 21. On or about December 31, 1999 Carleton terminated all of its employees and its industrial operations in Winthrop, resulting in permanent closure of both the upper and lower mills. *Id.* ¶ 22. The termination of employees and mill closures were the result directly or indirectly of Allied's actions. *Id.* ¶ 23.

On February 17, 2000 Carleton filed for protection under chapter 11 of the Bankruptcy Code, becoming a debtor-in-possession. *Id.* ¶ 24. From February until April 2000 the debtor-in-possession made brief, temporary recalls of the Affected Employees for the purpose of finishing goods in process for the benefit of creditors Allied and Fleet Capital Corporation. *Id.* ¶ 25.

Article XII of the CBA provides in relevant part:

> In the event of a permanent plant closing at either the upper or lower mill, employees with more than one (1) year seniority shall be eligible for severance payments in the amount of $275.00 for each of [sic] continuous service in which the employee actually worked more than nine hundred (900) hours. There shall be no proration of payments or payments for the partial years.

*Id.* ¶ 30.

On October 17, 2000 a lawsuit was filed in the matter of *Russell v. Allied Textile Companies, PLC* in the Maine Superior Court. *Id.* ¶ 31. The lawsuit, which sought statutory severance pay pursuant to 26 M.R.S.A. § 625-B, was removed to the United States Bankruptcy Court by Allied and docketed as Adversary Proceeding No. 00–1073. *Id.* The Maine Severance Pay Act, as amended in October 1999, provided: "There is no liability under this section for severance pay to an eligible employee if . . . [t]he employee is covered by an express contract providing for severance pay that is equal to or greater that

[sic] the severance pay required by this section." *Id.* ¶ 32. The *Russell* plaintiffs alleged that the severance pay computed pursuant to the Maine Severance Pay Act exceeded the amount of $275.00 per week provided by contract and accordingly the statute as amended in October 1999 allowed them to seek statutory severance pay. *Id.* ¶ 33.

On April 3, 2001 Allied filed a motion for partial summary judgment in the *Russell* action contending, *inter alia,* that the Maine Severance Pay Act could not be applied to PACE-represented workers at Carleton because the application of the state law as amended would "impair[ ] the CBA" in violation of the Contracts Clause of the United States Constitution. *Id.* ¶ 34. Allied argued:

> Carleton and the Union entered into the CBA in October 1998. At the time [the] CBA became effective, Carleton satisfied its severance pay obligations under the Severance Pay Statute, as it existed in 1998, by providing for severance payments in the CBA. Application of the 1999 amendment to the claims of the Union Plaintiffs will constitute an unconstitutional impairment of the contractual obligations set forth in the bargained-for CBA.

*Id.* ¶ 35. The *Russell* plaintiffs responded that "Allied does not escape severance pay liability because of a severance pay provision in a contract to which it is not a party." *Id.* ¶ 38. In its Reply, Allied asserted:

> . . . Carleton and the Union entered into the CBA in October 1998. At the time the CBA became effective, Carleton had no severance pay obligations to its Union personnel under the Severance Pay Statute, as it existed in 1998, because Carleton had instead bargained for severance payments in the CBA. Applica-

tion of the 1999 amendment to the claims of the Union Plaintiffs will constitute an unconstitutional impairment of the contractual obligations set forth in the bargained-for CBA, and, therefore, summary judgment should be entered in Allied's favor.

*Id.* ¶ 39. On May 24, 2001 Allied filed a request for certification to the Maine Attorney General, arguing that its motion brought into question the constitutionality of 26 M.R.S.A. § 625–B: "The potential constitutional issue, if reached, would be whether the 1999 amendment to 14[sic] M.R.S.A. § 625–B(3)(B) would unconstitutionally impair the pre-existing CBA between the union members and Carleton, as that may affect the liability of Allied, under the Maine and U.S. Constitutions[.]" *Id.* ¶ 40. The court granted the motion, and the Maine Attorney General intervened. *Id.*

In a telephone conference held October 16, 2001 Bankruptcy Judge Haines remarked, in relevant part:

> I also want to make the point that the plaintiffs have argued about Allied's standing to assert contract-based defenses to their claims based on the fact that Allied was not their employer, as such, and not a party to the collective bargaining agreement. . . . I think Allied is entitled to assert those defenses based on the collective bargaining agreement because State statute lassoes Allied as an employer under these circumstances, and there's nothing in the statute itself or the legislative history that indicates to me that the indirect employer[s] that are covered by subsection 1–C of section 625–B are to be used to multiply damages or provide to employees more than they would otherwise be entitled to obtain under the statute.

*Id.* ¶ 41.[3] Judge Haines then granted Allied's motion for summary judgment on the basis that the 1999 amendment operated prospectively and hence did not apply to the severance-pay claims in issue. *Id.* ¶¶ 42–43.

On January 11, 2002 counsel for PACE sent two letters to counsel for Allied requesting that, in light of Allied's successful assertion of the Contracts Clause defense, it fulfill its corollary contractual obligations for severance pay, unpaid and pending medical claims, vacation pay, perfect-attendance pay and other claims. *Id.* ¶¶ 44–46. By letter of January 14, 2002 Allied denied any contractual obligations. *Id.* ¶ 47. On January 18, 2002 PACE submitted Grievances 2002–1 and 2002–2 to Allied's attorneys, demanding that Allied pay the Affected Employees severance pay and other amounts due. *Id.* ¶ 48. By letter dated January 24, 2002 Allied refused to submit to arbitration, stating among other things: "First, Allied is not a party to the CBA, and therefore, Allied is not liable for amounts purportedly owed to Union workers under the CBA. Second, Allied is relying on the *existence* of the CBA for its defense under the Maine Severance Pay Statute. Allied has never suggested that it is a party to the CBA." Letter dated January 24, 2002 from Adam C. Paul to Jonathan S.R. Beal, Esq., attached as Exh. E to Complaint (emphasis in original).[4]

## C. Analysis

In its complaint, PACE alleges that Allied is liable for breach of the CBA by virtue of its status as a "single employer" with Carleton (Counts I and II) and should be judicially estopped, as a result of its successful defense in the *Russell* case, from denying its obligations under the CBA (Counts III and IV). Complaint ¶¶ 54–66. Count V seeks injunctive relief, and Count VI requests that the court compel arbitration. *Id.* ¶¶ 67–70. PACE agrees that Counts V and VI are viable only to the extent any of Counts I through IV remain in the Complaint. Dismiss Op-

**3.** The Maine Severance Pay Act defines an "employer" as "any person who directly or indirectly owns and operates a covered establishment. For purposes of this definition, a parent corporation is considered the indirect owner and operator of any covered establishment that is directly owned and operated by its corporate subsidiary." 26 M.R.S.A. § 625–B(1)(C).

**4.** By decision dated July 17, 2002 this court (Carter, J.) reversed in part the bankruptcy court's ruling in *Russell*, holding that the 1999 amendment to the Maine Severance Pay Act did in fact apply to the severance-pay claims of the first- and second-shift plaintiffs. *In re Carleton Woolen Mills*, 281 B.R. 409, 416 (D.Me.2002). The court remanded the case to the bankruptcy court for consideration of the merits of Allied's Contracts Clause defense. *Id.* at 416–17. In opposing Allied's motion to dismiss its judicial-estoppel claims in the instant case, PACE quotes from papers filed by Allied in the bankruptcy court in August and September 2002 following remand. Dismiss Opposition at 2–3. Assuming *arguendo* that these materials are cognizable, they are consistent with the position taken by Allied in the first round of *Russell*. *See, e.g., id.* at 3 ("Here Allied, by virtue of the plain language of the Statute, is considered an employer to the same extent as its subsidiary, Carleton. In other words, for purposes of the Statute, Allied stands in the shoes of Carleton (i.e., akin to a Chapter 7 trustee). As a result, all of the liabilities under the Statute potentially fall upon Allied, *as do all of the defenses....* It simply is not true that since Allied had no contractual obligations under the CBA, ergo Allied had no contractual interest protected by the Contracts Clause. Allied respectfully submits that the law is clear—if a party shows that its contractual expectations were frustrated by a change in the law, the party maintains standing under the Contracts Clause. Clearly, Allied's contractual expectations were frustrated by a change in the law.") (quoting from memorandum of law in support of Allied's renewed motion for summary judgment in *Russell*) (emphasis in original).

position at 2; *see also* Dismiss Memorandum at 3.

Allied contends that Counts I and II fail to state a claim because the complaint cannot fairly be read to allege an essential element: the existence of fraud or misrepresentation. Dismiss Memorandum at 8–9. It asserts that Counts III and IV fail to state a claim because the position taken in the *Russell* litigation is not "clearly inconsistent" with that taken in response to the instant claim. *Id.* at 10–11. I agree.

### 1. Breach of Contract Claims

█ PACE grounds Counts I and II exclusively on "29 U.S.C. § 185 and the common law." Complaint at 1. Section 185, which codifies section 301 of the Labor Management Relations Act ("LMRA"), "provides a federal cause of action in suits for violations of contracts between an employer and a labor organization representing employees in an industry affecting commerce." *Fant v. New England Power Serv. Co.*, 239 F.3d 8, 10 (1st Cir.2001) (citation and internal quotation marks omitted). PACE makes much of the "blurred" state of federal common-law analysis of "single employer" status for purposes of the LMRA. *See* Dismiss Opposition at 9–12. However, First Circuit caselaw in this particular context—in which a union seeks pursuant to section 301 of the LMRA to bind a non-signatory parent to a CBA signed by its subsidiary—is clear enough.

In *United Paperworkers Int'l Union v. T.P. Prop. Corp. ("Penntech II")*, 583 F.2d 33 (1st Cir.1978), the First Circuit upheld a decision of this court declining to pierce the corporate veil for purposes of liability under section 301 on the ground that, "although there was sufficient integration between Kennebec [the subsidiary] and Penntech [the parent] to challenge the re-

lationship between the two corporations, such challenge must fail because there was no fraud or misrepresentation by either Kennebec or Penntech as to the scope and application of the collective bargaining agreement," *United Paperworkers Int'l Union v. Penntech Papers, Inc. ("Penntech I")*, 439 F.Supp. 610, 621 (D.Me.1977). This position was reiterated in *Penntech Papers, Inc. v. NLRB ("Penntech III")*, 706 F.2d 18 (1st Cir.1983), in which the court noted:

> Here, the issue presented in the section 301 action is significantly different from the issue presented in the section 8(a)(5) [of the LMRA] proceeding. In the section 301 action the basic question presented was whether Penntech was the alter ego of Kennebec. In the section 8(a)(5) proceeding the question was whether the companies constituted a single employer.... Unlawful motive or intent are critical inquiries in an alter ego analysis, inquiries which are wholly absent in a single employer analysis.... It is the alter ego finding which will bind a nonsignatory to a collective bargaining agreement, not a finding of single employer status....
>
> In sum, whether two firms are a single employer for collective bargaining purposes and whether a single contract is binding on two separate corporations are not only different questions, but they may have different answers.

*Penntech III*, 706 F.2d at 23–24. *See also Pleasant St. I*, 960 F.2d at 1093–95 (declining to subject parent corporation to jurisdiction of court on basis of its relationship with subsidiary in absence of evidence on strength of which parent could be held to CBA between subsidiary and union—*i.e.*, evidence of fraudulent intent in acquiring, maintaining subsidiary).[5]

---

**5.** A more recent First Circuit case not cited by either party, *Massachusetts Carpenters Cent.*

One scours PACE's complaint in vain for an allegation of fraud or misrepresentation on the part of Allied in the acquisition and maintenance of Carleton. *See generally* Complaint. PACE alleges that such evidence does in fact exist, citing to a complaint filed in the matter of *Perrino v. Corrin (In re Carleton Woolen Mills, Inc.)*, 281 B.R. 409 (D.Me.2002). *See* Dismiss Opposition at 5, 12 & Exh. 1 thereto. Surely, however, the "narrow" exception to the bar against consideration of extrinsic evidence in a Rule 12(b)(6) motion does not stretch to cover an attempt by a plaintiff to fill gaps in its own pleading by belated reference to allegations in a complaint filed in a separate matter.

Allied's motion to dismiss Counts I and II for failure to state a claim accordingly should be granted.

### 2. Judicial–Estoppel Claims

I turn finally to Counts III and IV, as to which Allied again builds a meritorious case for dismissal. To successfully invoke the doctrine of judicial estoppel, "the proponent must show that the party to be estopped had succeeded previously with a position directly inconsistent with the one [he] currently espouses." *Faigin v. Kelly*, 184 F.3d 67, 82 (1st Cir.1999) (citation and internal quotation marks omitted). As Allied argues, *see* Dismiss

Memorandum at 10–11, the position it took in the *Russell* litigation is not directly inconsistent with the position it takes in response to the instant claims. Allied never argued in *Russell* that it was a signatory to, or bound by, the CBA. Rather, it argued that because a parent corporation can be held liable for statutory severance pay as a matter of Maine law, it should be permitted to assert the same defenses its subsidiary would be able to assert, including contract-based defenses.

Whatever the underlying merits of that position, it is consistent—rather than inconsistent-with Allied's current position that it is not a signatory to, and should not be bound by, the CBA. That Allied may have successfully used the CBA as a shield in one context is not in itself sufficient to bar it from wielding it as a sword in another. *See* 18B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4477 at 596–97 (2d ed. 2002) ("Application of judicial estoppel to the law elements of prior positions must take care to recognize that seeming inconsistencies may be explained by the different legal standards that may masquerade under similar legal expressions. Positions taken under one body of law may not be inconsistent with positions taken under a different body of law[.]").

Collection Agency v. Belmont Concrete Corp., 139 F.3d 304 (1st Cir.1998), arguably calls into question the proposition that a finding of wrongful motive is essential in so-called "alter ego" analysis. In *Belmont,* a collection agency for a multiemployer pension fund sought to hold a non-signatory corporation liable under the Employment Retirement Income Security Act ("ERISA") for a signatory's failure to make contributions to the fund. *Belmont,* 139 F.3d at 305. The court noted that (i) "the alter ego jurisprudence developed in cases brought under the National Labor Relations Act, 29 U.S.C. §§ 141–197, is applicable in cases brought under ERISA where the basis for imposition of liability is also the alter ego doctrine," and (ii) "there is no rule that wrongful motive is an essential element of a finding of alter ego status." *Id.* at 306, 308. However, *Belmont* concerned a nonsignatory that was both a sister corporation and successor to the defunct signatory, *id.* at 305, and the court expressly noted that it left "to another day the issue of what role antiunion animus would play in an ERISA suit for contributions to an employee benefit fund where liability is sought to be imposed on a parent company for the actions of its subsidiary on a veil-piercing theory," *id.* at 308 n. 8. *Belmont* accordingly appears to leave intact the holdings of *Penntech II* and *Penntech III,* as they pertain to the precise question and set of facts in issue here.

Counts III and IV accordingly fail to state a claim for judicial estoppel.

### III. Conclusion

For the foregoing reasons, I **DENY** PACE's motion to take judicial notice and recommend that Allied's motion to dismiss be **GRANTED** on the basis of failure to state a claim.

*NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within ten (10) days after being served with a copy thereof. A responsive memorandum shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

November 18, 2002.